No. 65,934

In the Matter of SUE CARPENTER, *Respondent.*

(808 P.2d 1341)

Opinion filed April 12, 1991.

*Stanton A. Hazlett*, deputy disciplinary administrator, argued the cause, and *Bruce E. Miller*, disciplinary administrator, was with him on the formal complaint for the petitioner.

*Jerold E. Berger*, of Topeka, argued the cause for respondent.

*Per Curiam:* This is an original attorney discipline proceeding filed by the Office of the Disciplinary Administrator against Sue Carpenter, of Topeka, Kansas, an attorney duly admitted and licensed to practice law in the State of Kansas.

At all pertinent times, Ms. Carpenter was employed as an Assistant District Attorney in Shawnee County. In such capacity, Ms. Carpenter served as the prosecutor in *State v. Clarence E. Jackson,* Case No. 85-CR-1692. Mr. Jackson was charged with two counts of rape. The alleged victim, A.V.W., was a mentally and physically handicapped resident of a Topeka nursing home. Mr. Jackson was an employee of that facility. A.V.W. had reported that on two occasions during the early morning hours of August 22, 1985, she was raped by Mr. Jackson. In a jury trial, held in April 1986, Mr. Jackson was found guilty on both counts. The convictions were affirmed by this court in an unpublished opinion (*State v. Jackson,* No. 60,134, filed October 30, 1987).

On June 25, 1987, A.V.W. filed a civil action against the nursing home seeking damages for the rapes. In connection with the civil suit, A.V.W.'s deposition was taken. Certain inconsistencies between A.V.W.'s trial and deposition testimony were brought to the attention of the Office of the Third Judicial District Public Defender. Said office made further investigations and a motion for a new trial based upon newly discovered evidence was filed. The portion of this motion pertinent herein concerns testimony and Ms. Carpenter's trial comments and actions in regard to the subject of whether or not A.V.W. had contracted gonorrhea as a result of the alleged rapes. Whether or not A.V.W. had gon-

orrhea was of particular significance as defendant Jackson denied any sexual contact with A.V.W. If A.V.W. had gonorrhea, the inference was that she had contracted the disease from Jackson, which would tend to corroborate her version of the events on the morning in question. This was particularly so since testimony was introduced that she had tested negative for the disease later on the day of the charged rapes. The question of when the subject of gonorrhea was first known to Ms. Carpenter, according to her statement filed herein, was that "just prior to trial" A.V.W., her mother, and her social worker advised Ms. Carpenter of the treatment for gonorrhea. On the second day of trial, Ms. Carpenter requested that an employee of the district attorney's office contact Memorial Hospital to corroborate A.V.W.'s having gonorrhea. Later the same day, the hospital called the employee back to advise that there were no hospital records indicating A.V.W. had ever been diagnosed with or treated for gonorrhea since the tests were negative. What the employee did with this information is unknown from the record before us. Ms. Carpenter's written statement filed herein states that she did not learn of the hospital data until the motion for new trial was filed.

The final hearing report of the disciplinary panel contains the following procedural data:

"Prior to the scheduled evidentiary hearing, the Chairman was notified by telephone that a stipulation had been reached between the Office of the Disciplinary Administrator, the respondent, Sue Carpenter, and her attorney, Jerold Berger, of Topeka, Kansas. The Chairman was further advised that all exhibits would be admitted and considered as part of the evidence in this case by virtue of the stipulation. The stipulation was reduced to writing and mailed to the panel members by the Office of the Disciplinary Administrator on January 26, 1990.

"Through a telephone conference with members of the panel and after consideration of the stipulated evidence and all aspects of this case, it was determined that a full evidentiary hearing would not be required since the evidence to be presented would be identical to the written stipulation and agreement submitted to the panel. It was further agreed by the panel members that a complete review of the exhibits, written stipulation and other evidentiary items would be necessary before rendering a decision."

The stipulation provides, in pertinent part:

"7. The public defender's Motion for New Trial Based On Newly Discovered Evidence, And The Interests Of Justice noted a number of reasons why a new trial should be granted. One of the reasons raised in the mem-

orandum dealt with the state's allegation at trial that [A.V.W.] had contracted gonorrhea as a result of the rapes.

"8. On June 11, 1988, Judge Thomas W. Regan ruled on Mr. Jackson's Motion for New Trial Based On Newly Discovered Evidence, And The Interests Of Justice. Judge Regan granted a new trial to Mr. Jackson. The judge noted that the gonorrhea issue was 'extremely important.' In addition, Judge Regan imputed knowledge to the respondent that the victim did not have gonorrhea. The judge further found that the respondent 'continued to use this inflammatory allegation and when the district attorney gained knowledge that there was no basis for that claim they withheld that information from the defendant, his attorney, the Court, and most importantly the jury.' Subsequently, the Shawnee County District Attorney's Office made the decision not to prosecute Mr. Jackson a second time.

"9. The allegation that [A.V.W.] contracted gonorrhea was first raised by the respondent in her opening statement. The respondent informed the jury: 'and you will hear testimony that the girl was subsequently treated for gonorrhea.' Later in the trial and during the state's presentation of evidence, two witnesses were asked questions by the respondent which elicited responses indicating that [A.V.W.] had contracted gonorrhea. Nancy Applehans, a social worker associated with the Indian Trails Nursing Home, answered in response to a question by the respondent that [A.V.W.'s] chart indicated that she had been receiving antibiotics for gonorrhea. An objection to this testimony was sustained, but it clearly was before the jury. Subsequent to the Applehans testimony, Dr. Steven Kowalski testified. He was asked detailed questions by the respondent regarding the transmission of gonorrhea and whether transmission could occur if a man does not ejaculate. The respondent also elicited testimony from Dr. Kowalski that he had tested [A.V.W.] for gonorrhea. Dr. Kowalski testified that he had tested [A.V.W.] and that the test showed no gonorrhea organism after 24 hours. In concluding her questioning of Dr. Kowalski, the respondent asked the doctor if his earlier testimony had not been that it could take about 5 days for the gonorrhea to develop and if a follow-up gonorrhea test had been conducted. The doctor's answer was in the affirmative. The respondent also asked questions of [A.V.W.] which elicited information indicating that she had been treated for gonorrhea.

"10. On the second day of trial, April 16, 1986, at approximately 10:30 A.M., the respondent directed an employee of the Shawnee County District Attorney's Office to place a call to Memorial Hospital and ask them for corroboration that [A.V.W.] had gonorrhea. An employee of the hospital returned the call on that same day and advised the district attorney's office that there were no records indicating that [A.V.W.] had gonorrhea or that she ever had been treated for gonorrhea.

"11. At all times during the trial and for a significant time prior to the trial, medical reports and lab results existed which showed that [A.V.W.] had never tested positive for gonorrhea. In fact, [a] test administered on September 6, 1985, showed that [A.V.W.] had an inflammation caused by

gardnerella, a common vaginal flora, and not caused by gonorrhea. The medical records of the nursing home, referred to in the testimony of Nancy Applehans, showed that the symptoms experienced by [A.V.W.] began not the week of the alleged assault, but approximately one month prior to the alleged assault. The medical records of the nursing home also show that the facility had been notified on August 24, 1985, by Memorial Hospital that the gonorrhea and venereal disease tests run on [A.V.W.] were negative. On September 10, 1985, the medical records of the facility show that the nursing home was notified by Memorial Hospital that the results of the lab work showed that [A.V.W.] had some gardnerella infection. All of the medical records and reports referred to were available to the respondent well in advance of trial and at the time of trial.

"12. At no time did the respondent take any action to clear up the impression left with the jury that [A.V.W.] had contracted gonorrhea from Clarence Jackson. In fact, the respondent cross-examined Mr. Jackson about the gonorrhea issue after she directed an employee of the District Attorney's Office to call Memorial Hospital to determine if [A.V.W.] had contracted gonorrhea. Additionally, the respondent again brought up the issue of gonorrhea in her statements to Judge Regan at Mr. Jackson's sentencing.

"13. The findings of Judge Thomas W. Regan in his Memorandum Opinion And Order are not disputed by the respondent. Although Judge Regan made no finding that the respondent had personal knowledge of the information concerning the gonorrhea, the respondent admits that she had an affirmative obligation to seek out tests and medical records concerning gonorrhea. These tests and records were available and accessible to the respondent. The respondent, as prosecutor, has an obligation to acquire all relevant information, regardless of its impact on the prosecution.

"14. Judge Regan, in his Memorandum Opinion And Order found that the issue of gonorrhea was 'extremely important' and that the evidence regarding gonorrhea 'would weigh heavily on the jury.' The respondent admits that she was negligent in not being diligent in obtaining the information provided to the district attorney's office by Memorial Hospital on the second day of the Clarence Jackson trial. Further, the respondent was negligent in not interviewing Dr. Kowalski prior to the trial and in not obtaining and reviewing all of the medical records prior to trial. Had she done so, she would have determined that [A.V.W.] did not contract gonorrhea. The result of respondent's negligence, was the denial of a fair trial to Clarence Jackson.

"15. The respondent's conduct described in this Stipulation And Agreement violated DR 1-102(A)(5) and (6) [1990 Kan. Ct. R. Annot. 165].

"16. The Disciplinary Administrator's Office recommends Public Censure as the appropriate sanction in this matter. The respondent understands that this is a recommendation and it is not binding on the hearing panel or the Kansas Supreme Court." (References to exhibit numbers deleted.)

The final hearing report concluded:

"Factual and Legal Summary

"The facts in this matter, having been stipulated to, are set out in detail in the written Stipulation and Agreement. A copy of said Agreement is attached to this report and incorporated herein by reference.

"Finding of fact

"In consideration of the aforementioned stipulation, a specific listing of the factual findings made by the Panel will not be necessary. Having reviewed all of the exhibits and material presented, the Panel finds that the evidence supports the Stipulation and Agreement. Thus, it is the finding of this panel that the respondent's conduct did, in fact, violate DR 1-102(A)(5) and (6).

"Recommendation

"It is the recommendation of this Panel that the respondent, Sue Carpenter, should be disciplined by public censure pursuant to Rule 203(a)(3) [1990 Kan. Ct. R. Annot. 137]. The nature of this recommended form of discipline conforms, in our opinion, with the guidelines set out by the American Bar Association Standards specifically IV 2.5."

DR 1-102(A)(5) and (6) (1990 Kan. Ct. R. Annot. 165) provide:

"DR 1-102 *Misconduct.*
"(A) A lawyer shall not:

. . . .

"(5) Engage in conduct that is prejudicial to the administration of justice.
"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

The only full evidentiary inquiry into this matter was apparently that held before Judge Regan on the motion for a new trial. A transcript of that proceeding is not included in the record. We do have, however, Judge Regan's memorandum opinion and order. Its inclusion herein, in pertinent part, is necessary, as follows:

"This Court next turns to the issue of the claim made by the State that the victim [contracted] gonorrhea from the defendant and the method used by the prosecution to clearly leave that impression with the jury.

"The evidence is *clear* that the District Attorney's Office knew that the victim did not have gonorrhea when she was tested for same shortly after this alleged attack. When the District Attorney's Office knew of that information is unclear but they knew it by the second day of the trial yet the prosecutor who in her opening statement told the jury 'You will hear testimony that [she] was subsequently treated for gonorrhea.' Again when Nancy Applehans was on the stand the prosecution elicited information from the witness that [the] victim was treated for gonorrhea. Again when Dr. Kowalski testified the prosecution asked about gonorrhea. The State after

introducing all of that evidence tried to cast a shadow over defendant when on cross-examination, the prosecutor went into the defendant's knowledge of medication by stating 'that all it takes to clear up any traces of gonorrhea was a prescription for antibiotics, to clear up a sore throat' and then saying 'penicillin is pretty easy to get from a doctor isn't it.'

"The new evidence clearly shows that the victim did not have gonorrhea and that the District Attorney's Office knew that, yet the evidence showed that the prosecutor continued to use this inflammatory allegation and when the district attorney gained knowledge that there was no basis for that claim they withheld that information from the defendant, his attorney, the Court and most importantly the jury.

"On April 15, 1986, twelve citizens of this community stood up and took an oath to decide this case only on the evidence and the law. They sat and listened to evidence for two (2) days and we now find they were misled as to what this Court considers a highly inflammatory allegation.

"*A review of the newly discovered evidence does not disclose that the prosecutor who tried this case had personal knowledge of the report but it clearly establishes that the District Attorney's Office knew and that knowledge is imputed to the trial district attorney.*

"A trial is not a sporting event where one should concern themselves with 'notches' in their belt but instead is a fundamental method used by our society to determine the truth. Evidence which is favorable to the State is presented but evidence that is harmful to the State must not be hidden. It is insulting to the jury who must weigh the evidence but more importantly it is the very fundamental responsibility of those presenting the evidence to do so openly and honestly.

"Not all new evidence requires a new trial but here it is the Court's opinion that the issue of gonorrhea was extremely important. The jury knew that the victim was not sexually active and the clear impression was that she contracted the virus and it came from the defendant since there was no other scientific evidence there can be no question that this alleged evidence would weigh heavily on the jury.

"The motion based on full review of the record is granted. The matter is set on the trial assignment docket for July 8, 1988, at 1:30 p.m. in Division One." (Emphasis supplied.)

Judge Regan's comments on the seriousness of the situation are appropriate. The majority of this court concludes that Judge Regan's finding that there was not evidence that Ms. Carpenter had personal knowledge of the hospital's response to the inquiry must be afforded credence and weight. There is nothing before us to indicate that additional information is available now that would not have been available for presentation before Judge Regan. This is the crucial area in this case. For Ms. Carpenter to proceed under the circumstances herein without learning the

result of the hospital inquiry is, as stipulated, negligence. For her to proceed with actual knowledge of the hospital's response would elevate the disciplinary rules violation into an area beyond negligence and into intentional wrongdoing. Under the circumstances herein, we take the case under the facts before us and accept the panel's findings that Ms. Carpenter violated DR 1-102(A)(5) and (6) and that the discipline imposed should be that of public censure.

IT IS THEREFORE ORDERED that Sue Carpenter be, and she is hereby, disciplined by public censure in accordance with Supreme Court Rule 203(a)(3) for her violation herein.

IT IS FURTHER ORDERED that this order shall be published in the official Kansas Reports and that the costs herein be assessed to the respondent.

ABBOTT, J., dissenting: The defendant in the criminal case from which the disciplinary complaint arose was incarcerated over two years as a result of his conviction and the State compensated defendant some $250,000 for the time he spent in prison as a result of his conviction in this case. Based on the record before us and statements of counsel at oral argument, I am dissatisfied with the panel's investigation and the failure to present crucial evidence in this case. I would remand the complaint to the hearing panel for a full hearing.

In addition to the partial stipulation set forth in the majority opinion, the parties submitted sixteen exhibits to the disciplinary panel. These exhibits highlight the importance of whether the alleged victim contracted gonorrhea as a result of what she alleged was her only sexual contact.

From the meager record before us and the statements of counsel at oral argument, the alleged victim, A.V.W., testified she was raped once while her roommate was out of the room and again some 20 minutes later while her roommate was asleep in a wheelchair in the room. Obviously, there were other patients in adjoining rooms and staff moving around the hallways and in and out of the rooms. A.V.W. did not report the incident for some twelve hours. There was no physical evidence that sexual intercourse had occurred. Tests for semen and body fluids performed on her, her undergarments, and bedding were all negative

and no pubic hair or other body hairs of Jackson were present. A.V.W. recanted her allegation of being raped to one or more employees of the nursing home. (It is impossible to tell from the record, but it appears only one so testified at the trial. However, on the motion for a new trial three persons so testified. They also testified at the motion for a new trial A.V.W. had a history of falsely reporting physical and sexual abuse.) One or more employees cast doubt on whether Jackson could have been in her room long enough to have accomplished what A.V.W. said he did.

Thus, the State was faced with going to trial with a weak case where it was basically the alleged victim's word against that of the defendant.

We are informed that Sue Carpenter, for the first time on the morning of trial, was informed by the alleged victim and her mother that she had had no prior sexual experience and had contacted gonorrhea as a result of the rapes. We do not have the entire trial transcript. In fact, we have very few pages excerpted from it. Sue Carpenter told the jury in her opening statement that it would hear evidence that the victim was subsequently treated for gonorrhea. A great deal of time was devoted by Carpenter at trial discussing gonorrhea with a treating doctor and the alleged victim. Other evidence presented to the jury concerning gonorrhea is set forth in the majority opinion.

Sue Carpenter had an employee of the Shawnee County District Attorney's office (Debbie Doerring) call Memorial Hospital on the morning of the second day of trial, requesting confirmation that the alleged victim had been treated for gonorrhea. Mrs. Dollard of Medical Records at Memorial Hospital called the District Attorney's Office and reported what the hospital records showed.

Although the stipulation is that the District Attorney's Office was informed "that there were no records indicating that [the alleged victim] had gonorrhea or that she had ever been treated for gonorrhea," Mrs. Dollard's notes clearly state that she told the District Attorney's Office the alleged victim was "[n]ot treated here for gonorrhea since tests were negative (checked tests with Dr. Sanders)." Thus, the record before us shows the District Attorney's Office was told the tests were negative, *i.e.*, that the

alleged victim did not have gonorrhea. This is far different information than what was stipulated to, *i.e.*, that there were no records indicating that the alleged victim had gonorrhea.

The defendant was questioned concerning gonorrhea and, although he denied ever having had the disease, Sue Carpenter very effectively cross-examined Jackson concerning his medical knowledge that antibiotics would cure gonorrhea and that he knew how to get a prescription for antibiotics without revealing he had gonorrhea. At sentencing, Sue Carpenter again informed the court that the alleged victim was treated for gonorrhea as a result of this once-only-in-her-lifetime sexual attack.

My basis for returning this case to the hearing panel is twofold. First, the criminal prosecution was a close case and any evidence the State could produce to support its case would have been significant. To have to reveal to the jury at trial that the alleged victim did not contract gonorrhea would have probably tipped the scales to a not guilty verdict or a hung jury.

Sue Carpenter does not appear to have testified at the motion for a new trial, at the State's hearing awarding compensation to Jackson, or at her disciplinary hearing. She did respond in writing to a letter from the Disciplinary Administrator, stating she had no knowledge or evidence indicating to her or showing that the alleged victim was not treated for gonorrhea until after the direct appeal and until the motion for a new trial was taken up. She goes on to state that Dr. Kowalski could not testify that gonorrhea was present absent additional medical reports which she did not have and, after she discovered she "could not provide those records, the issue was essentially abandoned."

In my lifetime in and around courtrooms, my experience has been that attorneys do not request employees to obtain evidence that is as important as this evidence was and then fail to find out whether or not the evidence is available.

The second reason I would remand is that at oral argument counsel for Sue Carpenter, in response to a direct question, informed the court that no one from the Disciplinary Administrator's Office has at any time talked to the person who took the message from Memorial Hospital and supposedly passed it on in some form. Thus, no evidence was before the panel and I find nothing in the record that any direct evidence was presented to

Judge Regan as to what information Sue Carpenter had and at what point in time she received the information.

This case is important to the bench and bar of this State and is of extreme importance to Sue Carpenter and her career. She may be a victim of simply relying on erroneous information furnished to her by an employee in her office. She could also be negligent, as she is willing to stipulate and the majority is willing to accept. Certainly, this court should satisfy itself that she had no knowledge or information prior to the trial's conclusion that the victim did not have gonorrhea. I feel the issue is too important to dispose of on the record before us and I would remand for a full hearing.

LOCKETT and ALLEGRUCCI, JJ., join in the foregoing dissenting opinion.