913 So.2d 775 (2005)
In re Roger W. JORDAN, Jr.
No. 2004-B-2397.
Supreme Court of Louisiana.
June 29, 2005.
Rehearing Denied November 29, 2005.
*776 Charles Bennette Plattsmier, Chief Disciplinary Counsel, Counsel for Applicant.
Capitelli & Wicker, Ralph Capitelli, Phelps Dunbar, Harry Allan Rosenberg, New Orleans, LA, Roger Jordan, Counsel for Respondent.
Ellis Paul Adams, Jr., Counsel for Louisiana District Attorneys Association (Amicus Curiae).
Robert Stephen Glaass, Counsel for Louisiana Association of Criminal Defense Lawyers (Amicus Curiae).

ATTORNEY DISCIPLINARY PROCEEDINGS
TRAYLOR, J.
This attorney disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Roger W. Jordan, Jr., a former Orleans Parish prosecutor.[1]

UNDERLYING FACTS AND PROCEDURAL HISTORY
On April 22, 2003, the ODC filed one count of formal charges against respondent, *777 alleging that he violated Rules 3.8(d)[2] and 8.4(a)[3] of the Rules of Professional Conduct by failing to timely disclose to the defense evidence tending to negate the guilt of the accused or mitigate the offense. The formal charges against respondent arise from the capital prosecution of Shareef Cousin and respondent's undisputed failure to turn over an eyewitness's statement to the defense.

FACTS AND PROCEDURAL HISTORY OF STATE V. COUSIN:
Before addressing the merits of the case, it is necessary to discuss, in some detail, the underlying facts and procedural history of Shareef Cousin's criminal case.
On March 2, 1995, Michael Gerardi was shot at point-blank range during an armed robbery attempt outside the Port of Call restaurant in New Orleans. Connie Ann Babin, Mr. Gerardi's date that evening and the only eyewitness to the murder, gave three separate statements to the New Orleans Police Department during the homicide investigation. When questioned on the night of the murder, a "visibly shaken" Ms. Babin told the police that she "did not get a good look at the perpetrators and probably could not identify them." (Statement 1).[4] In the second statement, which was tape recorded by police at Ms. Babin's home on March 5, 1995, three days after the murder, Ms. Babin was asked by a New Orleans Police Department detective whether she could "describe the person who did the shooting, his clothing?" In response, Ms. Babin said that she remembered the shooter was wearing an oversized denim jacket (Statement 2). She continued:
I don't know, it was dark and I did not have my contacts nor my glasses so I'm coming at this at a disadvantage.. I.. you know you could see outlines and shapes and things that stick out, but er.. the socks, I remember the colorful socks, because he kept drawing my attention to it when he kept fidgeting at his ankle area, ...
Ms. Babin went on to describe the shooter's hair and to say that the shooter was in his late teens and five feet seven or eight inches tall. After providing this description, Ms. Babin stated:
As he looked to me.. I keep getting this vision of a young man with, with an older man's face.. er I don't know that if this is coming.. er somewhere, or if I really did see this person ... if this is just coming from my imagination or what, but I.. every time I go over it and close my eyes er.. I remember thinking that he had an older man's face or a young body, on a young person.. how I visualize that, I don't know ...
On March 25, 1995, three weeks after the murder, Ms. Babin viewed a photographic lineup presented by the police and positively identified sixteen-year old Shareef *778 Cousin as the shooter (Statement 3).[5] Mr. Cousin was arrested a short time later and indicted for the first degree murder of Mr. Gerardi.
In the summer of 1995, the criminal case was assigned to respondent, then an assistant district attorney in Orleans Parish. When respondent was first assigned the case, he recalls that there were three identification witnesses.[6] However, Ms. Babin was the only witness to positively identify Mr. Cousin.[7]
In preparing for trial, respondent interviewed Ms. Babin. She informed him that she is nearsighted and only needs her contacts or glasses for nighttime driving, but not to see at close distances. Considering this information, respondent unilaterally determined that the absence of contacts or glasses on the night of the murder did not affect Ms. Babin's identification of Mr. Cousin as the shooter.
Respondent testified at his disciplinary hearing that he believed Ms. Babin's second statement provided significant additional details that tended to corroborate her identification of Mr. Cousin, especially the observation of the killer as having "an old man's face" on "a young person's body."[8] Respondent therefore concluded that, in his judgment, Ms. Babin's second statement was not material exculpatory evidence to which the defense would be entitled under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).[9] Accordingly, he did not produce that statement to Mr. Cousin's attorneys in response to their motion for the production of exculpatory evidence.[10] Respondent has never maintained that he was unaware of his obligation as a prosecutor to disclose exculpatory evidence pursuant to Brady.[11]
Prior to the trial, Mr. Cousin's defense team filed a motion to suppress Ms. Babin's identification of Mr. Cousin. Ms. Babin testified at the suppression hearing, and, in response to questions by respondent, explained the manner by which she came to identify Mr. Cousin in the photographic lineup conducted by the NOPD. On cross-examination, Mr. Cousin's attorney questioned Ms. Babin as to whether she had given a description of the perpetrator to the police "when they questioned you about this case." Ms. Babin testified she described the perpetrator as youthful, *779 slim, slightly shorter than Mr. Gerardi, with short cropped hair and a very distinctive "unusual" or "evil-looking" face. Mr. Cousin's attorney also asked whether Ms. Babin told the police "about any characteristics that you felt were outstanding." Ms. Babin said that she could only recall stating "that he had an older-looking face on a younger body." While Mr. Cousin's attorney attempted to discover whether or not Ms. Babin had given any additional descriptions to anyone else prior to the photographic lineup, respondent objected, and the question was rephrased. Eventually, Mr. Cousin's attorney questioned Ms. Babin as to whether she had provided any additional statements to the police other than the night of the murder (Statement 1) and the photographic lineup (Statement 3). Ms. Babin testified that her description had been consistent throughout. Thus, the only way that the defense could have known about Statement 2 would have been disclosure by respondent.
Ms. Babin testified at trial and repeated her positive identification of Mr. Cousin. Mr. Cousin was convicted of first degree murder. The same jury subsequently sentenced him to death in a bifurcated penalty phase.
Several days after the completion of the guilt phase of the trial but before the penalty phase, a copy of Statement 2 was delivered anonymously to defense counsel. On appeal, the defense raised as error respondent's failure to produce Statement 2 prior to trial. This Court did not reach that issue. Instead, a unanimous Court reversed Mr. Cousin's conviction and death sentence based on the erroneous admission of a witness' testimony as impeachment evidence and respondent's improper use of that evidence in closing argument. State v. Cousin, 96-2973 p. 16 (La.4/14/98), 710 So.2d 1065, 1073. Nevertheless, the Court commented in footnotes that Ms. Babin's second statement was "obviously" exculpatory, material to the issue of guilt, and "clearly" should have been produced to the defense under Brady and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Cousin, 96-2973 p. 2 n. 2, 710 So.2d at 1066 and 96-2973 p. 17 n. 8, 710 So.2d at 1073.
Following this court's decision in Cousin, the Orleans Parish District Attorney's Office elected not to retry Mr. Cousin for the murder of Michael Gerardi.

DISCIPLINARY PROCEEDINGS

DISCIPLINARY COMPLAINT
In May 1998, Mr. Cousin and his sister, Tonya Cropper, filed a complaint against respondent with the ODC, alleging, among other things, that respondent wrongfully suppressed Brady evidence by failing to disclose Ms. Babin's second statement. In his July 1998 response to the complaint, respondent asserted his belief that the witness's statement at issue was more inculpatory than exculpatory, and his determination that disclosure of the statement was not required by Brady. Respondent reiterated this assertion in his sworn statement taken by the ODC on June 16, 1999.
Following its investigation, the ODC dismissed the complaint against respondent. Ms. Cropper appealed the dismissal, but the hearing committee found that the ODC did not abuse its discretion in dismissing the complaint. Subsequently, the disciplinary board remanded the matter to the ODC with instructions to file formal charges against respondent.

FORMAL HEARING
The hearing committee conducted a formal hearing on the charges. ODC called several witnesses in its case in chief, including respondent, Shareef Cousin's defense attorney, and the complainant, Tonya Cropper. Respondent presented *780 character testimony from several members of the bench and bar.

Hearing Committee Recommendation
In a split decision, the chair and the public member of the committee found that the ODC did not prove a violation of Rules 3.8(d) and 8.4(a) as charged, and recommended that the formal charges against respondent be dismissed. In a nineteen page report, the majority found respondent's testimony credible regarding the nature of the Brady material. The committee acknowledged that respondent was in possession of the statement yet failed to disclose the second statement to the defense. However, the committee found no violation of Rule 3.8, as the committee determined that respondent reasonably believed that Ms. Babin's statement was inculpatory rather than exculpatory. The committee concluded that the defense was aware of the second statement and that it did not believe that the prosecution had an obligation "to help out the defense" by providing the statement. Based on these factual determinations, the majority of the committee concluded that respondent did not violate the Rules of Professional Conduct.
The lawyer member of the committee dissented, noting her objection to the majority's interpretation of a prosecutor's duty under Brady. She commented that she did not believe that the prosecutor has the discretion to determine whether to disclose exculpatory evidence to the defense. Rather, she interpreted Brady as imposing an affirmative duty on the prosecutor to disclose material exculpatory evidence, irrespective of whether a request was made by the defense.
The ODC filed an objection to the hearing committee's report and recommendation.

Ruling of the Disciplinary Board
The disciplinary board determined that respondent technically violated the Rules of Professional Conduct, but found that no discipline was appropriate and dismissed the formal charges against respondent. While the board adopted the hearing committee's factual findings, it rejected the committee's legal conclusions and application of the Rules of Professional Conduct. The board determined that the committee erred in its finding that respondent did not violate either Brady or Rule 3.8(d) when he failed to produce Ms. Babin's second statement. The board concluded that respondent was ethically bound to voluntarily disclose Statement 2, which tended to negate the guilt of the accused by calling into question Ms. Babin's positive identification of Cousin as the perpetrator of the crime. By failing to do so, respondent violated Rule 3.8(d).
The board found no aggravating factors present in this case, but found "numerous and weighty" mitigating factors, including the absence of a prior disciplinary record, absence of a dishonest or selfish motive, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, character and reputation, and remorse. The board concluded:
While the board finds that respondent's actions constitute a technical violation of the Rules of Professional Conduct, considering all of the factors, particularly respondent's good faith and lack of intent, the lack of any actual injury, respondent's excellent reputation among judges and colleagues and his unblemished disciplinary record, and considering the purpose of lawyer discipline, the board finds that no formal discipline is warranted. See, In re Hartley, 2003-2828 (La.4/2/2004), 869 So.2d 799. [internal footnote omitted]
*781 Based on this reasoning, the formal charges against respondent were dismissed.
The ODC sought review of the board's ruling in this Court. We ordered the parties to submit briefs addressing the issue of whether the record supports the disciplinary board's report. After reviewing the briefs filed by both parties, we docketed the matter for oral argument.[12]

DISCUSSION
In our system of justice, we entrust vast discretion to a prosecutor. In re Toups, XXXX-XXXX p. 10 (La.11/28/00), 773 So.2d 709, 715. Because a prosecutor is given such great power and discretion, he is also charged with a high ethical standard. Id. A prosecutor stands as the representative of the people of the State of Louisiana. He is entrusted with upholding the integrity of the criminal justice system by ensuring that justice is served for both the victims of crimes and the accused. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." Brady, 373 U.S. at 87, 83 S.Ct. 1194. The actions, or inactions in this case, of the prosecutor are paramount to a fair administration of justice; and the people of this state must have confidence in a prosecutor's integrity in performing his duty to disclose exculpatory evidence in order for the system to be just. Any intentional deviation from the principle of the fair administration of justice will be dealt with harshly by this Court.
This is a case of first impression in the State of Louisiana. Never before have we been confronted with the issue of disciplining a prosecutor for failing to disclose "evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor." Rules of Professional Conduct, Rule 3.8(d). The language of Rule 3.8(d) is recognizably similar to the prosecutor's duty set forth in Brady, supra, and its progeny. Moreover, the Louisiana Code of Criminal Procedure likewise imposes a corresponding statutory duty on a prosecutor to disclose exculpatory evidence to the defendant. See La.C.Cr.P. arts. 718, 719(A) and 722; State v. Edwards, 99-0911 p. 2 (La.9/24/99), 746 So.2d 1267, 1268.
The duty of a prosecutor to disclose exculpatory evidence is embedded in the principle that a criminal defendant is deprived of a fair trial when the state withholds exculpatory evidence that is material to guilt or punishment. The state's failure to disclose material evidence favorable to a criminal defendant implicates more than the defendant's discovery rights; the prosecutor has an affirmative duty to disclose such evidence under the Fourteenth Amendment's Due Process Clause. Failure to reveal this evidence implicates the defendant's right to a fair trial. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Marshall, 94-0461 p. 12 (La.9/5/95), 660 So.2d 819, 825.
Whether the questioned evidence is material under Brady has been explained by this Court in Marshall, 94-0461 p. 16 (La.9/5/95), 660 So.2d 819, 826:
The issue is whether the exculpatory evidence is material under the Brady-Bagley-Kyles line of cases. Evidence is *782 material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. This Court must provide a cumulative evaluation of the suppressed evidence, keeping in mind that Marshall does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. Marshall need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Kyles, 514 U.S. at 440, 115 S.Ct. 1555.
During his testimony before the hearing committee, respondent testified that he did not believe Ms. Babin's second statement was material and did not qualify as the type of evidence to be disclosed under Brady. Specifically, respondent stated that he thought the evidence was inculpatory rather than exculpatory as Ms. Babin recounted specific details regarding the defendant's clothing and colorful socks. While the definition of materiality set forth in Kyles and its progeny may be seen as leaving a prosecutor with a degree of discretion, it does not. Kyles, 514 U.S. at 438, 115 S.Ct. 1555.
Exculpatory evidence includes evidence which impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Additionally, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), reiterates the principle that there is no distinction between exculpatory evidence and impeachment evidence under Brady. Clearly, Ms. Babin's second statement negates her ability to positively identify the defendant in a lineup. The statement should have been disclosed to the defense. See State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065. As we noted in our decision overruling Mr. Cousin's conviction, citing Justice Souter's eloquent statement in Kyles, a prosecutor anxious about "tacking too close to the wind will disclose a favorable piece of evidence" and "will resolve doubtful questions in favor of disclosure." Cousin, 96-2973 p. 17 n. 8, 710 So.2d at 1073 n. 8, citing Kyles, 514 U.S. at 439, 115 S.Ct. 1555. Respondent failed to produce evidence which was clearly exculpatory and should have resolved this issue in favor of disclosure.
Accordingly, we agree with the factual findings of the disciplinary board that respondent violated Rule 3.8(d) by failing to disclose the second statement of Ms. Babin to the defendant.

SANCTIONS
La. Const. art. V, § 5(B) confers original jurisdiction over attorney disciplinary matters to this Court.[13] Having found respondent violated Rule 3.8(d) of the Rules of Professional Conduct, the sole remaining issue is the discipline to be imposed.
In considering the issue of sanctions, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana *783 State Bar Ass'n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984). Thus, we must consider the facts as they are presented herein in deciding the type of discipline to impose on respondent.
The violation of Rule 3.8(d) by a prosecutor raises a great deal of concern to this Court. Rule 3.8(d) exists to ensure that the integrity of the prosecutorial arm of our criminal justice system is maintained. Moreover, prosecutors are in a unique position from other members of the bar as they are immune from civil liability under Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Neither are they realistically subject to criminal sanctions. Our research reveals only one instance in which a judge held a prosecutor in contempt of court for failing to disclose evidence. See In re Burns, XXXX-XXXX (La.11/28/01), 800 So.2d 833.[14] Thus, absent consequences being imposed by this Court under its authority over disciplinary matters, prosecutors face no realistic consequences for Brady violations.[15]
In deciding the appropriate sanction, we begin our analysis with Supreme Court Rule XIX, § 10(C), which sets forth the following considerations in imposing discipline:
1. Whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
2. Whether the lawyer acted intentionally, knowingly, or negligently;
3. The amount of the actual or potential injury caused by the lawyer's misconduct; and
4. The existence of any aggravating or mitigating factors.
By withholding material exculpatory evidence from a criminal defendant, respondent violated a duty owed to the public. As a prosecutor, respondent is charged with a high ethical standard and may not carelessly skirt his obligation. See In re Toups, supra. Although neither Brady nor Rule 3.8 incorporates a mental element, Rule XIX, § 10(C) does. Based on the testimony of respondent and the character evidence discussed below, we find that respondent knowingly withheld Brady evidence.[16] As to the element regarding actual injury, this Court reversed Shareef Cousin's conviction on other grounds and granted him a new trial. However, this Court's actions in reversing *784 the conviction does not vitiate the potential injury to the criminal justice system, or to Cousin, caused by respondent's actions, and warrants serious consideration and discipline by this Court.
As to the issue of aggravating and mitigating factors, we find the only aggravating factor present in this case is respondent's substantial experience as a prosecutor. However, on the issue of mitigation, we find a host of factors present. Specifically, we find the absence of any prior disciplinary record, absence of a dishonest motive, full and free disclosure to the board, a cooperative attitude towards the proceedings, and good character and reputation in the legal community.
As stated above, the issue of discipline against a prosecutor for his violation of Rule 3.8 is res nova in the State of Louisiana. While this Court has the benefit of Rule XIX considerations, we have no prior case law on the issue. However, Louisiana is not the first jurisdiction to address the issue of a prosecutor's failure to disclose evidence to a defendant. Our brethren in North Carolina, Kansas, South Carolina, Ohio and Iowa have imposed discipline against an attorney who fails to disclose evidence pursuant to Brady. Thus, we find some guidance in their decisions. The sanctions imposed in other jurisdictions range from public reprimand or censure to a six-month suspension from the practice of law.[17] Based upon the facts of this case, we conclude the appropriate baseline sanction for respondent's misconduct is a three-month suspension from the practice of law. However, in light of the mitigating factors, we will defer this suspension in its entirety, subject to the condition that any misconduct during a one-year period following the finality of this judgment may be grounds for making the deferred suspension executory, or imposing additional discipline, as appropriate.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Roger W. Jordan, Jr., Louisiana Bar Roll number 19642, be suspended from the practice of law for a period of three months. It is further ordered that the suspension shall be deferred in its entirety, subject to the condition that any misconduct by respondent during a one-year period following the date of finality of this court's judgment may be grounds for making the deferred suspension executory, or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.
JOHNSON, J. concurs in part, dissents in part, for the reasons that follow.
I concur in the majority's opinion that respondent knowingly withheld Brady evidence, *785 that respondent's experience as a prosecutor was an aggravating factor, that the Court's actions in reversing defendant's conviction failed to invalidate the potential injury to the criminal justice system, or to defendant, and that respondent's behavior warrants discipline by this Court. However, because of the actual injury caused by respondent's prosecutorial misconduct, I dissent from the majority's conclusion that respondent's suspension should be deferred.
As cited in the majority opinion, Louisiana Supreme Court Rule XIX, § 10(c) sets forth four factors to be considered when imposing lawyer discipline. The third factor in this analysis is the "amount of the actual or potential injury caused by the lawyer's misconduct." Regarding actual injury, the majority opinion states that "this Court reversed Shareef Cousin's conviction on other grounds and granted him a new trial." Thus, the majority opinion adopts the reasoning, stated explicitly by the disciplinary board in the lower proceedings, that no injury resulted from respondent's conduct since the defendant's conviction was reversed. Although reversal of defendant's sentence of death by lethal injection amends the wrongful sentence, it fails to negate the actual injury caused by respondent's misconduct.
Pursuant to Louisiana Supreme Court Rule XIX, § 10(c), this court has held that an attorney caused an actual injury because the attorney's failure to pay a client's medical bill resulted in a negative report to a credit agency. In re Felicia Nicole Graham, 2001-2930 (La.2/8/02), 807 So.2d 829, 832. In another matter, we determined that an attorney caused an actual injury when he abandoned his legal practice and failed to return a $750 fee to a client and delayed the client's legal proceedings. In re James Ashley Vaughan, XXXX-XXXX (La.10/26/01), 801 So.2d 1058, 1060-1061. In my view, the taking of a liberty interest is an even greater injury. As one legal commentator noted, "liberty is absolute and the loss of it is the greatest of all human injustices."[1] Indeed, how can we ignore the injury caused by the wrongful taking of freedom, or the despair that inevitably follows as a defendant sits on death row and prepares for execution by lethal injection. "The execution of a legally and factually innocent person would be a constitutionally intolerable event," wrote Justice Sandra Day O'Connor in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). It is noteworthy that Shareef Cousin faced this predicament at the age of sixteen. The United States Supreme Court has since determined that execution of individuals who were under the age of 18 at the time of their capital crimes is unconstitutional. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
Wrongful conviction constitutes an actual injury.[2] Moreover, the United States Supreme Court has held that a wrongful conviction "has continuing collateral consequences." Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). Michael Anthony Williams, who was recently freed from Angola State Penitentiary after serving 24 years for a crime *786 he did not commit, and who, like Shareef Cousin, was convicted at the age of sixteen, described his time in prison as "a living hell."[3] He stated that "a lot of terrible things happened to me while I was in there.[4]" Williams confessed that when he was younger, he was sexually abused "while guards turned their backs."[5] Persons wrongfully convicted lose time during incarceration that cannot be retrieved. Furthermore, inmates, generally, leave prison with no savings, dismal employment prospects, and oftentimes medical and mental issues.[6] Wrongful conviction can also cause significant stress on family relationships including the financial pressure that may have been created by legal fees associated with the wrongful conviction.
In the present case, disciplinary charges were filed against respondent by Shareef Cousin[7] and his sister, Tonya Cropper. Tonya Cropper's testimony at the Hearing Committee describes the emotional turmoil that the Cousin family endured as a result of defendant's wrongful conviction.[8]
*787 In 1976, the United States Supreme Court held that individual prosecutors have absolute immunity under common law tort claims as well as section 1983 suits. Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). This court adopted the Imbler court's reasoning in Knapper v. Connick, when we determined that "prosecutors are entitled to absolute immunity for conduct within the course and scope of their prosecutorial functions ..." Knapper v. Connick, 96-0434 (La.10/15/1996), 681 So.2d 944, 950. Thus, prosecutors have absolute immunity even in instances, such as the present case, where the prosecutor suppressed exculpatory information. Knapper v. Connick, 681 So.2d at 949-950. However, the Imbler, supra, decision also identifies the legal community's responsibility for maintaining the integrity of prosecutors and deterring prosecutors from violating standards of the legal profession. The court concluded that "a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers." Id. at 429. Therefore, our function in dispensing disciplinary action is critical both for upholding the highest ethical and professional standards among prosecutors and ensuring fundamental fairness for defendants. As expressed by the Honorable Calvin Johnson of Orleans Parish Criminal Court, in a letter contained in the record to then Orleans Parish District Attorney Harry Connick,[9] Rule 3.8 was established to ensure professional responsibility among lawyers as well as to guarantee the constitutional due process rights of criminal defendants.[10]
*788 In determining whether respondent caused an actual injury pursuant to Louisiana's Supreme Court Rule XIX, § 10(c), our focus should be on the unnecessary and unlawful suffering of the wrongfully convicted[11] as a result of the prosecutorial misconduct, not just the reversal of the wrongfully imposed sentence. Because, in my view, loss of a liberty interest is more valuable than financial loss or injury to one's credit, I would impose an actual period of suspension.
NOTES
[1] Respondent is now a prosecutor with the District Attorney's Office in Jefferson Parish.
[2] Rule 3.8 of the Rules of Professional Conduct provides in pertinent part as follows:

The prosecutor in a criminal case shall:
* * *
(d) Make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, ... except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.
[3] Rule 8.4 of the Rules of Professional Conduct provides, in pertinent part:

It is professional misconduct for a lawyer to:
(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
[4] This statement by Ms. Babin is incorporated into the initial police report, which respondent disclosed to defense counsel.
[5] Statement 3, like Statement 1, was disclosed to the defense pretrial.
[6] Transcript of Proceedings before the Hearing Committee, p. 264 (hereinafter referred to as "Hearing Transcript").
[7] The two other witnesses included a man who worked at the Port of Call restaurant and a tourist from New York who was within the same block of the restaurant when the shooting occurred. While the Port of Call employee, who was smoking a cigarette outside when the shooting occurred, initially made a positive identification of Mr. Cousin, he later recanted his testimony during further discussions with respondent. Respondent testified that the tourist made only a tentative identification of Mr. Cousin when she was shown a photo line-up through the mail. Hearing Transcript, p. 264-65.
[8] Hearing Transcript at pgs. 275-276.
[9] Throughout this opinion, we refer to the exculpatory evidence as "Brady" material, referring to the landmark United States Supreme Court case of Brady v. Maryland, supra, which held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
[10] As the "senior assistant" prosecuting the Cousin case, it was totally within respondent's discretion to decide what evidence would be disclosed.
[11] Hearing Transcript, p. 265-266.
[12] Respondent also filed an objection in this Court to several factual findings made by the Disciplinary Board.
[13] La. Const. art. V, § 5(B) provides:

Original Jurisdiction. The supreme court has exclusive original jurisdiction of disciplinary proceedings against a member of the bar.
[14] The record contains a letter dated January 5, 1998, authored by the Honorable Calvin Johnson of Orleans Parish Criminal Court addressed to Orleans Parish District Attorney Harry Connick. This letter voices concern over the increase in violations of Rule 3.8(d) by "some of your assistant district attorneys." Judge Johnson reiterates that Rule 3.8 was established to ensure not only professional responsibility but also to ensure a criminal defendant's right to due process. He warns that the court will hold the assistant district attorney personally responsible for failure to disclose Brady evidence and will report the assistant to the Disciplinary Counsel to "prosecute that individual to the fullest extent possible." A copy of this letter was hand delivered to the respondent. See Exhibit D.
[15] We strenuously note here today that we do not suggest that the withholding of Brady evidence is a prevalent practice amongst prosecutors in the State of Louisiana. Rather, we believe the failure to disclose evidence by a prosecutor is a rare occurrence.
[16] The ABA's Standards for Imposing Lawyer Sanctions, defines "knowledge" as:

The conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.
[17] See, e.g., North Carolina State Bar v. David Hoke & Debra Graves, No. 04-DHC-15 (Dec. 2, 2004) (public reprimand imposed by the Disciplinary Hearing Commission of the North Carolina State Bar; significant mitigating factors noted as to both respondents); In re Jordan, 278 Kan. 254, 91 P.3d 1168 (2004) (public censure); In re Grant, 343 S.C. 528, 541 S.E.2d 540 (2001) (public reprimand by consent); Committee on Prof'l Ethics & Conduct of Iowa State Bar Ass'n v. Ramey, 512 N.W.2d 569 (Iowa 1994) (indefinite suspension with no possibility of reinstatement for three months); Office of Disciplinary Counsel v. Jones, 66 Ohio St.3d 369, 613 N.E.2d 178 (1993) (six-month suspension); In re Carpenter, 248 Kan. 619, 808 P.2d 1341 (1991) (public censure).
[1] Alberto B. Lopez, $10 And A Denim Jacket? A Model Statute For Compensating The Wrongly Convicted, 36 GA.L.REV. 665, 690 (2002).
[2] In a dissenting opinion, Justice Stevens wrote as follows: "An official determination that a person has committed a crime may cause two different kinds of injury. It may result in tangible harms such as imprisonment, loss of the right to vote or to bear arms, and the risk of greater punishment if another crime is committed. It may also severely injure the person's reputation and good name." Spencer v. Kemna, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).
[3] Penny Brown Roberts, La. Frees Inmate, 40, Believed Innocent, BATON ROUGE ADVOCATE, March 12, 2005.
[4] Id.
[5] Id.
[6] See, Joan Petersilia, When Prisoners Return to Communities: Political, Economic, and Social Consequences, 65 FED. PROBATION 3, 5 (2001), cited in Shawn Armbrust, When Money Isn't Enough: The Case For Holistic Compensation of the Wrongfully Convicted, 41 AM.CRIM. L.REV. 157, n. 125 (2004).
[7] There is no direct testimony from Shareef Cousin regarding the impact of his wrongful death sentence.
[8] Cropper now resides in Boston, Massachusetts but at the time of the conviction and sentencing, she resided in Plano, Texas. During the trial Cropper drove from Plano and stayed through the duration of the trial. Cropper testified that after the conviction and sentencing she was numbed by the whole procedure. She couldn't believe that her brother was going to die. During this time her family was bitter with the justice system; they still hold resentment towards the courts.

Cropper said that Roger Jordan's insistence on the guilt of her brother infuriated her. On the Geraldo talk show, it was Jordan's face that represented her brother's conviction and death sentence. Even after the dismissal of the charges, she stated that Jordan continued to insist on the guilt of her brother.
Cropper expressed how she was too angry, hurt, and confused to testify during the penalty phase of the trial. She told how her brother had an outburst of emotion in court during Jordan's closing statement. The same emotional fury flowed through her veins. After the denial of a new trial, she, her four sisters, and her mother had an emotional, tear-filled prayer with Cousin before he was sent to Angola State Penitentiary. As he was taken away from his family, Cousin cried for the first time since the ordeal began.
She tells how she hated to see her brother in jail, and how she had only visited him once since he was initially arrested for the murder. She spent a lot of time dwelling on the fact that her brother was going to die of lethal injection. She finally decided to subject herself to seeing her brother behind bars.
Cropper goes on to tell of the travel accommodations that had to be made so the whole family would have an opportunity to see her brother in jail. She drove eight hours from Texas to pick her sisters and mom up; none of them had a car. The family would then travel two and a half hours to Angola. After the visit she would transport her family back to New Orleans. She would then rest for several hours and then drive back to Texas. This was all in one day. She made the trip faithfully every month until Cousin was removed from death row. Her daughter also had to endure seeing her uncle in jail. She never wanted her child to think her uncle was a murderer.
She felt Jordan had no regard for her family or for her brothers rights because her brother was arrested for four separate counts of armed robbery. She believes Jordan thought no one cared about her brother and he could do anything to win at all cost, regardless of her brother's due process rights. Her brother believed his attorney who told him that the robbery plea bargain was in his best interest because the judge was going to try him (and sentence him) on each count separately, and he would have to serve two times the sentence he is currently serving if found guilty of those robberies separately. See Hearing Committee Transcripts page 200, lines 8-15. Cropper did not understand why Jordan seemed to feel that her brother's life was so disposable.
Cropper explained that an injustice has been done not only to the Cousin family but also to the victim, Gerardi's, family because that family has no closure in the death of their son.
[9] The letter is referenced in the majority opinion.
[10] In addition to the actual injury caused by respondent's violation of Rule 3.8, there are other allegations of misconduct cited in the complaint, though no formal charges were brought by the Office of Disciplinary Counsel. Specifically, during testimony at a motion for new trial, it was alleged that Jordan's co-counsel, Assistant District Attorney Byron Berry, may have removed several of defendant's alibi witnesses from outside the courtroom to the District Attorney's office. Later, when the time came for those witnesses to be called, respondent failed to tell defense counsel where the witnesses were.

Furthermore, there are some concerns with defendant's guilty pleas to armed robbery. Cousin was arrested and charged with First Degree Murder on March 27, 1995. This is the arrest for the instant matter. The next day, March 28, 1995, Cousin was arrested and charged with four counts of armed robbery. Cousin pled guilty to the armed robberies before he was found guilty of murder, but after he had been arrested and charged with the crime.
Cousin later petitioned this Court to grant supervisory writs and order post-conviction relief for the judgments entered against him in the armed robbery cases. In his writ application, Cousin argued that his guilty plea had been involuntary since he was never advised of the consequences of his plea. He claimed that he had not been apprised that his guilty plea would be used against him as four aggravating factors in the penalty phase of his capital trial. Additionally, he argued that he was not told that his guilty plea would prevent him from testifying in his capital trial, as the "prior" convictions would be used to impeach him if he got on the stand. This court denied defendant's application for writ of certiorari. J. Johnson dissented, stating that she was "not convinced that (Cousin) understood the consequences of his guilty pleas." State v. Cousin, 98-3197 (La.1/6/1999), 734 So.2d 645.
[11] According to the Center on Wrongful Convictions at Northwestern Law School, the following persons were wrongly convicted and later exonerated in Louisiana: Gene Bibbins, Robert H. Blanton III, Gregory Bright, Dennis Brown, Albert Ronnie Burrell, Vernon Chapman, Clyde A. Charles, Shareef Cousin, Jack Graves Favor, Ronald Gibson, Sr., Michael Ray Graham, Jr., Mary Katherin Hampton, Larry Hudson, Isaac Knapper, Curtis Kyles, Edgar Labat, Ryan Matthews, Clifton Alton Poret, Johnny Ross, Anthony Scire, Clarence Smith, John Thompson, Earl Truvia, Hayes Williams, Michael Anthony Williams, Calvin Willis. htt p:/www.law. northwestern.edu/ depts/clinic/wrong ful/ exonerations/ LouisianaList.htm.

Also, See generally, Jim Dwyer, Peter Neufeld, and Barry Scheck, Actual Innocence, (2000). The authors tell the stories of persons they have helped who have been exonerated through the use of DNA evidence. The authors state that the "emphatic belief of witnesses, police, and prosecutors in the correctness of their accusations  even in the face of undeniable evidence of innocence  drills into issues at the marrow of humanity." Id. at XII.