*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-BG-851

IN RE ANDREW J. KLINE, RESPONDENT.

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 441845)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN 522-09)

(Argued May 22, 2014                          Decided April 9, 2015)

*Seth A. Rosenthal* for respondent.

*Elizabeth A. Herman*, Deputy Bar Counsel, with whom *Wallace E. Shipp, Jr.*, Bar Counsel, *Jennifer P. Lyman*, Senior Assistant Bar Counsel, and *Jelani C. Lowery*, Senior Staff Attorney, were on the brief, for petitioner.

*Elizabeth J. Branda*, Executive Attorney, Board on Professional Responsibility, for petitioner.

*James Klein* and *Samia Fam*, Public Defender Service, filed a brief as *amicus curiae*.

*Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, *Elizabeth Trosman* and *Ann K. H. Simon*, Assistant United Stated Attorneys, *Jerri U. Dunston*, Director, United States Department of Justice, and *Ann C. Brickley*, Attorney Advisor, Professional Responsibility Advisory Office, United States Department of Justice, filed a brief as *amicus curiae*.

Before WASHINGTON, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

WASHINGTON, *Chief Judge*: This matter comes before us upon the Report and Recommendation of the Board on Professional Responsibility ("the Board"). The Board recommended that a 30-day suspension be given to Andrew J. Kline ("Kline") after finding that Kline violated Rule 3.8 (e) of the District of Columbia Rules of Professional Conduct ("Rule 3.8 (e)"). Rule 3.8 (e) prohibits a prosecutor in a criminal case from intentionally failing to disclose to the defense any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused. Bar Counsel takes no exception to the Report and Recommendation of the Board. Kline argued, *inter alia*, that he did not violate Rule 3.8 (e) because his ethical duties are coextensive with the duties imposed under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Kline relies on the "material-to-outcome" standard recognized by the United States Supreme Court in *Brady*'s progeny to argue that a prosecutor cannot violate Rule 3.8 (e) unless there is a reasonable probability that the information or evidence withheld made a difference in the outcome of the trial. We hold that Kline's interpretation of Rule 3.8 (e), which incorporates a retrospective materiality analysis, is not the appropriate test for determining whether a prosecutor has violated Rule 3.8 (e). We also hold that Bar Counsel proved by clear and convincing evidence that Kline intentionally failed to disclose information in violation of the rule. However, we

conclude that given the confusion regarding the correct interpretation of a prosecutor's obligations under the rule, sanctioning Kline would be unwarranted.

**I.**

The Board adopted the following findings of fact: In 2001 and 2002, Kline was an Assistant United States Attorney ("AUSA") in Washington, D.C., assigned to prosecute violent crimes, including a shooting incident involving Arnell Shelton ("Shelton"). Shelton was charged with felony assault in the drive-by shooting of Christopher Boyd ("Boyd"). Prior to trial, Shelton's attorney filed an alibi notice. Thus, a principal issue at trial was the reliability of the government's eyewitnesses.

In the course of preparing the Shelton case, Kline spoke to D.C. Metropolitan Police Department ("MPD") Officer Edward Woodward ("Officer Woodward"), the first officer at the crime scene. The Hearing Committee found that Officer Woodward told Kline that he first interviewed Boyd at Greater Southeast Hospital shortly after the shooting, and that Boyd told him that he did not know who had shot him. Kline took notes during his conversation with Officer Woodward, and those notes included the following information:

> Boyd told officer at hospital that he did not know who shot him—appeared maybe to not want to cooperate at the time. He was in pain and this officer had arrested him for possession of a machine gun. . . .

There is an arrow pointing to this note.[1]

Shelton's attorney, Carlos Venegas of the District's Public Defender Service ("PDS"), requested discovery pursuant to *Brady* and specifically sought "prior inconsistent [or] non-corroborative" statements by witnesses and "any other information, which . . . impeaches a witness' testimony." Kline answered the *Brady* request by informing Mr. Venegas that the government was not "in possession of any truly exculpatory information."

PDS attorney Anna Rodriques subsequently assumed representation of Shelton. She testified that Kline never told her of the Boyd Hospital Statement. Her testimony was corroborated by documentary evidence, including Kline's supplemental discovery responses that disclosed other potentially exculpatory evidence.

---

[1] The Hearing Committee was unable to make a finding as to whether the arrow is in Kline's handwriting since Kline did not acknowledge that annotation.

5

Right before the jury was selected, Attorney Rodriques raised a separate *Brady* concern. Kline responded that he was "not sure how one could conjure up a *Brady* argument in this case since there was no doubt that Shelton was the shooter." The trial court responded:

> Because you are sure [sic] you have the guy, no one could conjure up a *Brady* argument? . . . That is why *Brady* doesn't leave it up to the prosecutor, for that very reason. You are always sure you have got the right guy or you wouldn't be prosecuting.

Kline assured the trial court that he was "especially careful when it came to *Brady* evidence." However, Kline still had not disclosed the substance of the Boyd Hospital Statement either directly or indirectly.

The first trial was held between March 5 and 7, 2002. The government's case hinged on the ability of the three eyewitnesses to the shooting, Andrew Durham, Christopher Boyd, and Boyd's mother, Cassandra Williams, to credibly identify Shelton as the assailant. Shelton's wife testified, as an alibi witness, that he was home at the time of the shooting. The jury was unable to reach a verdict, and a mistrial was declared.

Soon thereafter, Kline left the United States Attorney's Office ("USAO") and the new AUSA assigned to prosecute the case forwarded the note pertaining to the Boyd Hospital Statement in Kline's file. A letter to the defense was prepared disclosing the information but before it could be mailed, that attorney left the office due to a family emergency and did not return to the case. When the case was subsequently reassigned, the new prosecutor, AUSA Wanda Dixon, disclosed the Boyd Hospital Statement to the defense. A new trial was held and despite the disclosure of the Boyd Hospital Statement, the defendant was convicted and his conviction was upheld on appeal.

Because Kline failed to disclose the Boyd Hospital Statement, Bar Counsel charged him with violating Rule 3.8 (e). Kline, while hedging on whether he in fact remembered that this evidence was in his file, stated that he did not believe he had an obligation to turn it over because he did not believe it was *Brady* evidence. He also argued that the gist of the statement had been included in police reports that had been turned over to the defense. He stated further that he believed his disclosure obligation was only to turn over evidence that fell within the purview of *Brady*—*i.e.* evidence that would prove to be material to the outcome of the trial. Additionally, Kline presented the testimony of an AUSA responsible for training,

who testified that he was in charge of "*Brady*" training at the USAO at the time and while disclosure would have been prudent, the training Kline received from the U.S. Attorney's Office on its *Brady* obligations would not have put [Kline] on notice that Rule 3.8 (e) required him to disclose information that was not "material" in the *Brady* sense.

The Board concluded that Kline violated Rule 3.8 (e) by intentionally withholding the Boyd Hospital Statement and recommended a sanction of 30 days suspension. Kline timely appealed.

## II.

"The discipline of attorneys, including determination of appropriate sanctions, is the responsibility of this court." *In re Howes*, 39 A.3d 1, 12-13 as *amended nunc pro tunc*, 52 A.3d 1 (D.C. 2012) (citation omitted). "Though we review *de novo* the Board's legal conclusions, we must accept the Board's evidentiary findings if they are supported by substantial evidence in the record." *Id.* (citation and footnote omitted).

The question of whether and, if so, when a prosecutor's ethical and constitutional duties to disclose potentially exculpatory information to a defendant intersect continues to be a topic of much debate throughout the country. It is unquestionable, however, that constitutional protections in the criminal context serve a fundamentally different purpose than disciplinary proceedings in the ethical context. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 110 (1976) (noting a distinction between the character of the evidence and the character of the prosecutor). For the first time, this court must address whether the ethical disclosure obligations imposed on prosecutors by Rule 3.8 (e) require disclosure of information that may later be deemed "immaterial" to the outcome of the trial.

Kline argues that Rule 3.8 (e) of the District of Columbia Rules of Professional Conduct, governing the ethical obligations of prosecutors to disclose evidence tending to negate the guilt or mitigate the offense of the accused, must be read as co-extensive with a defendant's constitutional right to a fair trial as contemplated by the Supreme Court in *Brady*, and its progeny. Thus, Kline argues that the rule necessarily contains a "materiality" component, which cannot be determined until after trial has been concluded, and the merits of any appeal have been resolved. More specifically, Kline argues that there can be no violation of

Rule 3.8 (e) unless and until it has been determined that the failure of the government to disclose any potentially exculpatory information has sufficiently impacted the fairness of the trial to a degree sufficient to constitute a *Brady* violation. This level of unfair prejudice is commonly understood as that which is "material" to the outcome of a trial.

Kline's argument regarding "materiality" focuses on the following definition: whether or not the outcome of the proceeding would have been different had the evidence or information been disclosed. It is important to note, however, that this "material-to-outcome" standard was not promulgated in the landmark Supreme Court case of *Brady v. Maryland*, but was first formally adopted years later in *United States v. Bagley*, 473 U.S. 667 (1985). *But see Agurs*, 427 U.S. at 107-10 (adopting an approach very similar to the material-to-outcome test formally adopted in *Bagley*). This distinction is important because evidence material to the preparation of the defense is often confused with "material to the outcome of the trial," *i.e.*, prejudice. While the Supreme Court in *Brady* promulgated a definition of exculpatory material for disclosure purposes— evidence that is "material to guilt or innocence"—it was not until *Bagley* that the term "material" was defined as prejudice sufficient to support a belief that had the information been disclosed, the outcome of the trial likely would have been

different. *See id.* at 674-75. This was because, as a reviewing court, the Supreme Court recognized that reversal of a conviction is unwarranted unless it is reasonably probable that the evidence withheld would have made a difference at the trial. *See id.*

Since the *Agurs* and *Bagley* decisions, commentators and legal professionals often lump the "material-to-outcome" test with *Brady* because a "true" *Brady* violation includes the following three requirements: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The ethical rule regarding prosecutorial disclosure in the District of Columbia, as in most states, incorporated the "tends to negate guilt" standard promulgated by the ABA in its Model Code of Professional Responsibility to define the class of evidence required to be disclosed under Rule 3.8. However, the District of Columbia may be the only jurisdiction in the country that adopted an

"intentionality" requirement as a part of its black letter rule.[2]  It appears that we adopted that language from the 1986 ABA Standards for Criminal Justice. Specifically, Rule 3.8 (e) reads as follows:

> The prosecutor in a criminal case shall not: . . . . (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense upon request any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

D.C. R. OF PROF'L CONDUCT R. 3.8 (e) (2014).

The 1986 ABA Standards for Criminal Justice, which is also mentioned with approval in our commentary to Rule 3.8, provides some guidance on the role *Brady* played in the development of the standards for determining what material must be

---

[2]  However, at least one state has decided to read an "intentionality" requirement into its rule.  *See In re Attorney C*, 47 P.3d 1167, 1174 (Colo. 2002). Alabama has chosen to adopt a "willfulness" standard.  *See* ALA. R. OF PROF'L CONDUCT R. 3.8 (d) (2014).  The ABA rule has no "intentionality" or "willfulness" requirements by its terms.  *See* MODEL RULES OF PROF'L CONDUCT R. 3.8 (d) (2013).  Rule 3.8 (d) is the ABA counterpart to District of Columbia Rule 3.8 (e).

disclosed to the defendant. Specifically, the commentary notes that, "[t]he standard adopts the definition of exculpatory material contained in the Supreme Court's decision in *Brady v. Maryland*, that is, material that tends to negate guilt or reduce punishment. Although the test necessarily presents some questions of relevance, prosecutors are urged to disclose all material that is even possibly exculpatory as a prophylactic against reversible error and possible professional misconduct." ABA STANDARDS FOR CRIMINAL JUSTICE: *The Prosecution Function* § 3-3.11 (2d ed. 1986). This "tends to negate guilt or mitigate the offense" standard had made its first prominent appearance in the ethical realm in 1969, in the ABA Model Code of Professional Responsibility DR 7-103 (b) ("DR 7-103 (b)"), which was promulgated before the *Brady* prejudice component was defined in *Bagley*. *See* MODEL CODE OF PROF'L RESPONSIBILITY DR 7-103 (b) (1969) (hereinafter "DR 7-103 (b)"). It stands to reason, therefore, that the later added prejudice component from *Bagley*, did not play and could not have played a role in the development of the "tends to negate guilt or mitigate the offense" standard promulgated pre-*Bagley*.

Further, as the Supreme Court recognized in *Kyles,* "[t]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence

tending to exculpate or mitigate." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The Supreme Court reiterated that basic tenet in *Cone*, noting that "[a]lthough the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady*, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." *Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) (citations omitted).

Retrospective analysis, while it necessarily comports with appellate review, is wholly inapplicable in pretrial prospective determinations. *See Lewis v. United States*, 408 A.2d 303, 306-07 (D.C. 1979). Specifically, in *Lewis*, this court recognized that *Brady* and its progeny were retrospective evaluations that were difficult to apply in a pretrial context. "While it is therefore true that the constitutional question commonly comes up retrospectively, the due process underpinning of *Brady-Agurs* is a command for disclosure [b]efore an accused has to defend himself." *Lewis*, 408 A.2d at 306-07. It is impossible for a trial court at the pretrial stage to require "the defendant . . . to satisfy the test of materiality normally associated with a retrospective *Brady-Agurs* inquiry, namely, materiality to outcome." *See id.* at 307. "On the premise that there can be a pretrial ruling under *Brady*, this abandonment of the material-to-outcome test is necessary

because there can be no objective, ad hoc way to evaluate before trial whether [evidence or information] will be material to the outcome. No one has that gift of prophecy." *Id.* Therefore, "[t]o argue that the court can apply a material-to-outcome test before trial is to argue a contradiction." *Id.* (citing *Agurs*, 427 U.S. at 107-08).

In short, although significant overlaps exist in a pretrial versus post-trial ethical analysis, it makes little common sense to premise a violation of an ethical rule on the effect compliance with that rule may have on the outcome of the underlying trial, because there can be "no objective, ad hoc way" for a prosecutor "to evaluate before trial whether [evidence or information] will be material to the outcome." *See Lewis*, 408 A.2d at 307. For that reason, it is important not to use *Brady* as a "canon of prosecutorial ethics." *Commonwealth v. Tuma*, 740 S.E.2d 14, 20 n.2 (Va. 2013).

Kline argues, however, that the last sentence in the comment to Rule 3.8 makes it clear that the "material-to-outcome" test that is ingrained in federal constitutional law sets forth a prosecutor's ethical boundaries. The comment to Rule 3.8 states the following:

> Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which

> in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense. This rule is intended to be a distillation of some, but not all, of the professional obligations imposed on prosecutors by applicable law. The rule, however, is not intended either to restrict or to expand the obligations of prosecutors derived from the United States Constitution, federal or District of Columbia statutes, and court rules of procedure.

D.C. R. OF PROF'L CONDUCT R. 3.8 cmt. 1 (2014). Kline argues that requiring any more or less from a prosecutor than is required to avoid a true *Brady* violation would alter, expand, or restrict that prosecutor's obligations under the constitution. However, Kline's reliance on the comment to support his interpretation of the rule is unavailing because the text of the rule is always controlling when it comes to interpreting a rule. *See* D.C. R. OF PROF'L CONDUCT Scope (6) (2014) ("[t]he Comments are intended as guides to interpretation, but the text of each Rule is controlling."). Kline's reading of the commentary—interpreting it as establishing a *Brady* materiality test for disclosure—may indeed be what was intended by some of those who championed inclusion of the limiting language in the comment.[3]

---

[3] It is regrettable that we lack a contemporaneous explanation for our court's decision to add the two sentences to the end of Comment [1]. However, Kline's reliance on a single opinion letter as legislative history is unavailing. We preliminarily note that classifying a letter from the Department of Justice (DOJ) expressing the opinion of the Office of the Deputy Attorney General written to the rules committee as "legislative history" sheds no light on the thinking of the

(continued . . .)

However, to the extent Rule 3.8 addresses matters (such as disclosure) that also are subject to requirements "derived from the United States Constitution, federal or District of Columbia statutes, [or] court rules of procedure," the rule should not be read as an interpretation of those requirements that either expands or contracts what our court has heretofore (or hereafter) interpreted them to mean. Rather, the rule governs professional conduct; it may overlap with what constitutional due process requires, but its requirements are not co-extensive with due process (or with statutory obligations or court procedural rules).

Moreover, Kline's argument that the comment imposes a "material-to-outcome" test on Rule 3.8 (e) not only is inconsistent with the (pre-*Bagley*) history

---

(. . . continued)
decision makers and, therefore, must be viewed with some skepticism. Legislative documents are generated by the "legislature" (or rulemaking body). *See* BLACK'S LAW DICTIONARY 919 (8th ed. 1999) (legislative means "of or relating to lawmaking or to the power to enact laws"). Obviously, this court did not give the DOJ all that it asked for. Against the DOJ's wishes, for example, the court kept the language of paragraph (e) largely intact and refrained from adding an explicit materiality requirement. *Cf.* Rule 3.8 (g) (containing explicit materiality requirement). Moreover, evidence which is of little probative value should not control over the customary meaning of the words used in the rule and the comment. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 755 (D.C. 1983) ("[W]here legislative materials are without probative value, or contradictory, or ambiguous, they should not be permitted to control the customary meaning of words.") (internal quotation marks and alteration omitted).

of the rule but also is counterintuitive when it comes to the development and implementation of rules designed to guide ethical behavior. "In *Brady* cases [] an appellate court sits not as a disciplinary committee of the state bar—but rather as a court of review, ensuring only that the criminal conviction satisfies the threshold requirements of due process." *Tuma*, 740 S.E.2d at 20 n.2. By contrast, ethical rules are designed to guide behavior, whereas appellate review of criminal cases is to ensure, after the fact, that a criminal defendant has received a fair trial. Thus, to the extent the Rule 3.8 commentary suggests a materiality test, we reject it. We see no logical reason to base our interpretation about the scope of a prosecutor's ethical duties on an ad hoc, after the fact, case by case review of particular criminal convictions.[4]

Only a few state courts have been forced to grapple with this specific issue. However, a review of the case law from those states is instructive to our analysis. One case that is factually quite similar to the case at bar, and therefore is particularly persuasive, is *In re Jordan*, 913 So. 2d 775 (La. 2005). That case

---

[4] We note that in Virginia, the Virginia Bar rewrote their disclosure rule for prosecutors, "clarifying that the prosecutor's ethical duty under that rule is not coextensive with the prosecutor's legal duty under *Brady*." *See* Virginia Legal Ethics Comm. Op. 1862 (2012) (discussing "Timely Disclosure of Exculpatory Evidence and Duties to Disclose Information in Plea Negotiations").

involved an eyewitness identification to a murder that occurred at night. *Id.* at 777-78. The witness stated that she did not have her glasses on the night in question so she was "coming at this at a disadvantage because she was nearsighted and needed contacts or glasses for nighttime driving." *Id.* at 777. The prosecutor failed to disclose the witness's admission that she was nearsighted and was not wearing her glasses on the night of the murder because the prosecutor "unilaterally determined that the absence of contacts or glasses on the night of the murder did not affect" the witness's identification of the defendant. *Id.* at 778. During his disciplinary hearing, the prosecutor testified that he did not violate his ethical obligations by failing to disclose the information to the defense because he did not believe the witness's statement about needing her glasses or contacts was material and thus, the evidence did not qualify as the type of evidence required to be disclosed under *Brady*. *Id.* at 782.

The Supreme Court of Louisiana concluded otherwise and noted that the language of Rule 3.8 (d)[5] is actually not unlike the "prosecutor's duty as set forth in *Brady*." *Id.* at 781. The Supreme Court concluded that because impeachment evidence is exculpatory (citing *Bagley*), and because *Brady* and its progeny require

---

[5] Louisiana's Rule 3.8 (d) is the analog to our Rule 3.8 (e).

disclosure of exculpatory evidence, the prosecutor had violated Rule 3.8 (d). The Court went on to specifically reject the notion that the definition of materiality set forth in *Kyles* and its progeny can be read as leaving a prosecutor with a degree of discretion about whether to disclose exculpatory evidence. In concluding that the material-to-outcome standard in *Kyles* should not be considered in determining whether the ethical rule was violated, the court relied in part on Justice Souter's statement in *Kyles* that a prosecutor anxious about "tacking too close to the wind will disclose a favorable piece of evidence" and "will resolve doubtful questions in favor of disclosure." *Kyles*, 514 U.S. at 439.

In 2012, the Supreme Court of North Dakota reached a similar conclusion, holding that a prosecutor's ethical obligation to disclose evidence to the defense is broader than the duty under *Brady* or the criminal discovery rule. *See In re Disciplinary Action Against Feland*, 820 N.W.2d 672, 678 (N.D. 2012). In reaching its conclusion that there is a distinction between compliance with an ethical rule and ensuring that an accused is not wrongly convicted, the Court looked to the different purposes and objectives served by the two proceedings. "The primary concern in disciplinary proceedings is to ensure attorneys act in conformity with the ethical standards embodied in the Rules of Professional Conduct, regardless of the surrounding circumstances." *Id.* "A prosecutor's

ethical duty to disclose all exculpatory evidence to the defense does not vary depending upon the strength of the other evidence in the case." *Id.* It stands to reason that "a prosecutor's failure to comply with the duties imposed by Rule 3.8[] should not be excused merely because, based upon the other evidence presented at trial, the result in the case would have been the same." *Id.*

While the Supreme Courts of Louisiana and North Dakota have interpreted the disclosure requirements of prosecutors more broadly, there are courts that have decided that it would be confusing to prosecutors if they were required to comply with two different disclosure standards. *See In re Riek*, 834 N.W.2d 384 (Wis. 2013). This is much the same argument raised by Kline here and was clearly part of what motivated some members of the committee that developed this ethical rule to add the Comment to Rule 3.8 (e). Interestingly, the Wisconsin Supreme Court relied, in part, on the Comment to our rule as support for its decision to limit the disclosure obligations of prosecutors under their ethical rules to only that information that later proves to be material to the outcome of the trial. *See In re Riek*, 834 N.W.2d at 696. The court also relied on decisions by courts in Ohio, Louisiana, and Colorado to support its conclusion that the ABA's Opinion on the Ethical Duties of Prosecutors that requires the disclosure of all potentially exculpatory information had not been universally adopted. While the case cited

from Louisiana for this proposition is *In re Jordan*, and while we disagree that a fair reading of that case supports the Wisconsin court's decision, we do acknowledge that both Colorado and Ohio have reached conclusions consistent with that of Wisconsin. *See In re Attorney C*, 47 P.3d 1167 (Colo. 2002) and *Disciplinary Counsel v. Kellogg-Martin*, 923 N.E.2d 125 (Ohio 2010).

Contrary to the concerns expressed by those courts, however, we do not believe that interpreting Rule 3.8 to require greater disclosure than that which may result in an unfair trial for a criminal defendant will give rise to any confusion among local prosecutors as to what they are obligated to disclose. First, and foremost, we find it instructive that all of the prosecutors who later became aware of the existence of the Boyd Hospital Statement after Kline left the U.S. Attorney's Office recognized that the statement was potentially exculpatory and had to be disclosed. Even Kline's supervisor, while acknowledging that no specific training was provided regarding a prosecutor's obligations under Rule 3.8, testified that it would have been prudent for Kline to have disclosed the statement. Therefore, and despite the language in the Comment to Rule 3.8, prosecutors in the USAO were aware that their disclosure obligations are not determined by whether this court ultimately concludes that the non-disclosure resulted in a *Brady* violation.

Further, adopting an ethical rule that errs in favor of disclosure will better ensure that criminal defendants in the District of Columbia receive a fair trial. All too often we are asked to decide whether information withheld by the government was exculpatory and whether that information undermined the fairness of the criminal trial in that case. Often, the call is a close one, with the court making the best judgments it can about the impact the exculpatory evidence would have had on a jury's verdict or whether the information would have led to other potentially exculpatory information that might have impacted the jury's verdict. *See, e.g.*, *Agurs*, 427 U.S. at 108 (describing the materiality test as "an inevitably imprecise standard"); *Boyd v. United States*, 908 A.2d 39, 56 (D.C. 2006) (characterizing evidence in a *Brady* inquiry as "difficult to assess"); *Ginyard v. United States*, 816 A.2d 21, 32 (D.C. 2003) (acknowledging as "imprecise" the inquiry into whether evidence would help the defense or affect the outcome of the trial). These are judgment calls that can undermine the public's trust and confidence in the courts because they are not being made by a jury of one's peers but by a court that is sitting and reviewing a cold record. And, even where an appeals court ultimately decides that the failure of a prosecutor to disclose certain potentially exculpatory information should result in a new trial, the defendant has already spent a significant amount of time in jail with the concomitant consequences that incarceration has on the defendant's life and that of his or her family. In fact, even

in those instances where the trial court becomes aware of the potentially exculpatory information or evidence and orders its disclosure during trial, the adverse impacts on a defendant can be great. *See United States v. Stevens*, 08-CR-231 EGS, 2009 WL 6525926 (D.D.C. Apr. 7, 2009) (vacating jury's guilty verdict against Senator Ted Stevens on corruption charges where prosecution failed to produce exculpatory evidence until nearly five months after the trial and after Senator Stevens narrowly lost his reelection bid).

In *Zanders v. United States*, 999 A.2d 149 (D.C. 2010), we confirmed that "[i]t is not for the prosecutor to decide not to disclose information that is on its face exculpatory based on an assessment of how that evidence might be explained away or discredited at trial, or ultimately rejected by the fact-finder." *Id.* at 164. And subsequently in *Miller v. United States*, 14 A.3d 1094 (D.C. 2011), we recognized that the duty of disclosure is not dependent on whether a defendant's constitutional rights are later found to have been violated because the failure to disclose the information affected the outcome of the trial. *Id.* at 1109.

While it has not been argued, we are also mindful that were we to adopt Kline's interpretation of the comment to reading of Rule 3.8 (e) in a manner consistent with a prosecutor's obligations under *Brady*, *et al.*, the result could have

significant potential adverse impacts for prosecutors generally. For example, in order to violate Rule 3.8 (e), there must be evidence presented that a prosecutor intentionally failed to disclose exculpatory evidence. However, a *Brady* violation can be "inadvertent." *See Strickler*, 527 U.S. at 281-82. Second, Rule 3.8 (e) only requires disclosure of evidence about which the prosecutor has actual knowledge, while under *Brady* potentially exculpatory evidence known by other government actors is imputed to the prosecution. Third, a violation of Rule 3.8 (e) requires a finding that the prosecutor knew or reasonably should have known that the evidence tended to negate the guilt of the accused or mitigate the offense, whereas a *Brady* violation is not focused on the conduct of the prosecutor, only whether the evidence was potentially exculpatory and whether the outcome of the trial was seriously affected. In sum, Rule 3.8 (e), by its very terms, cannot be read as being coextensive with *Brady* and we doubt seriously whether local prosecutors would support such an interpretation of the rule.

For all of these reasons, we hold that Rule 3.8 (e) requires a prosecutor to disclose all potentially exculpatory information in his or her possession regardless of whether that information would meet the materiality requirements of *Bagley*, *Kyles*, and their progeny.

**III.**

Having determined that a prosecutor's ethical obligations are not governed by whether the courts ultimately conclude that a criminal conviction was obtained in violation of a defendant's constitutional rights, we turn now to the merits of the underlying case against Kline. Kline argues that he did not intentionally fail to disclose the Boyd Hospital Statement, but admits that he cannot say "what [his] thinking was" nine years ago when he was prosecuting the case against Shelton. The "standard of clear and convincing proof requires evidence that will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Dortch*, 860 A.2d 346, 358 (D.C. 2004) (citation omitted). Direct proof of a lawyer's state of mind is "rarely available." *In re Starnes*, 829 A.2d 488, 500 (D.C. 2003) (per curiam).

In the context of other ethical rules, we have adopted various definitions of "intentional." *See, e.g.*, *In re Mitrano*, 952 A.2d 901, 925 (D.C. 2008) (standard for intentional misappropriation requires a showing that attorney handled the entrusted funds "in a way that reveals [] an intent to treat the funds as . . . [his] own") (citation omitted); *In re Ukwu*, 926 A.2d 1106, 1116 (D.C. 2007) (intentional neglect of client's case "does not require proof of intent in the usual

sense of the word. Rather, neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter") (internal quotation marks and citation omitted); *In re Lenoir*, 585 A.2d 771, 778 (D.C. 1991) (intentional failure to carry out a contract of employment requires an element of purposefulness or deliberateness or, at a minimum, an aggravated neglect); *In re Reback*, 487 A.2d 235, 240 (D.C. 1985), *aff'd in relevant part*, 513 A.2d 226 (D.C. 1986) (en banc) (intentional failure to seek a client's objectives requires an element of purposefulness or deliberateness or, at a minimum, an aggravated neglect).

We believe that the intentionality requirement under Rule. 3.8 (e) best fits the definition employed in the context of intentional failures to act—namely, that "intentional" requires an element of purposefulness or deliberateness or, at a minimum, of aggravated neglect. *See In re Lenoir*, 585 A.2d at 778 (citation omitted). In assessing intent, the "entire mosaic" of conduct should be considered. *In re Ukwu*, 926 A.2d at 1117.

The Board argues that there is an "entire mosaic" of circumstances surrounding the failure to disclose that supports the conclusion that Kline's failure to produce the Boyd Hospital Statement was a purposeful or deliberate act. First, Kline not only spoke to Officer Woodward about the substance of the Boyd

Hospital Statement, but he also wrote the information down on his legal pad demonstrating that he understood that the victim "told [the] officer at [the] hospital that he did not know who shot him."[6] Second, Kline also consistently maintained that he simply did not think the information was exculpatory. ("I can tell you that I did not at the time think, hmm, this is material evidence that needs to be disclosed to the defense, nor do I think that as I sit here today. As a matter of fact, I can tell you based on my experience and my training that it was not and is not material."). Third, AUSA Dixon's statements on the record to the trial court that Kline did not disclose the information because he did not view the evidence as exculpatory supports Kline's own testimony in that regard.[7] Fourth, Kline was reminded of his disclosure obligations on more than one occasion by the trial court during the trial in this case and was even verbally reprimanded for failing to disclose other

---

[6] The Hearing Committee credited Officer Woodward at the disciplinary hearing. We find Kline's challenges to the credibility findings of Officer Woodward unavailing. *See In re Temple*, 629 A.2d 1203, 1208-09 (D.C. 1993) ("The fact-finder who hears the evidence and sees the witnesses is in a better position to make [credibility] determinations, having the benefit of those critical first-hand observations of the witness' demeanor or manner of testifying which are so important to assessing credibility.").

[7] Although it appears that AUSA Dixon may have gotten that information from her supervisors and not directly from Kline, this statement though minimally probative, still adds to the quantum of evidence presented to satisfy the clear and convincing hurdle. The statement is probative, however, because it corroborates Kline's own statements in that regard—namely, that he just did not think this material was exculpatory.

potentially exculpatory information. Despite the fact that he was on notice that the trial court was concerned about his failure to disclose other information in the case, he still did not disclose the Boyd Hospital Statement, instead assuring the trial court that he was "especially careful" when it came to the disclosure of *Brady* information. Further, the Board found that Kline's testimony about his lack of knowledge about the Boyd Hospital Statement was less than convincing.

On appeal, Kline argues that he does not remember whether he consciously thought about the information. However, before the hearing committee he testified that he knew Boyd did not make an identification of Shelton at the hospital, but blamed his terrible note taking for misunderstanding the importance of that testimony and interpreting it to mean that Boyd was merely unable to tell the officer who shot him at that time for reasons associated with his having been shot. Kline also testified that because he believed the statement was ambiguous, he did "not recognize [it] as exculpatory." He further testified that he believed the information had been effectively turned over because the police reports disclosed "97.7%" of the information.

After reviewing the entire record, we see no reason to disturb the findings of the Hearing Committee and the Board that Kline consciously decided that the

Boyd Hospital Statement did not have to be produced and thus acted with "deliberateness." *See In re Lenoir*, 585 A.2d at 778. Therefore, we agree that the evidence is such that it produces in the mind of the trier of fact a "firm belief" that Kline intentionally withheld the statement because he did not think it was exculpatory. *See In re Dortch*, 860 A.2d at 358.

## Sanction

"In disciplinary cases, the Board must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Ukwu*, 926 A.2d at 1115. "This court, in turn, must accept the Board's findings of fact, and we also apply the 'substantial evidence' standard." *Id.*

In *In re Howes*, this court dealt with a violation of Rule 3.8 (e) for the first time; however, we did not have to decide whether an ethical violation of Rule 3.8 (e) was dependent on whether the nondisclosure resulted in a *Brady* violation because the prosecutor in that case stipulated that he had violated the rule. *See In re Howes*, 39 A.3d at 1 n.1. Thus, this is the first opportunity this court has had to decide the scope of a prosecutor's ethical responsibilities under Rule 3.8 (e).

"Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed. We grant deference to the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted. However, the responsibility for imposing sanctions rests with the court in the first instance." *Id.* at 13 (internal citations and quotations omitted).

While the issue of an appropriate discipline for a prosecutor who violates his disclosure obligations under Rule 3.8, but who is not found to have been dishonest, is *res nova* in the District of Columbia, other jurisdictions have imposed discipline that range from public reprimand or censure to a six-month suspension from the practice of law.[8] Here, the Board recommends that Kline be suspended for 30 days, a sanction that is clearly within the wide range of sanctions that generally

---

[8] *See, e.g.*, *In re Jordan,* 91 P.3d 1168 (Kan. 2004) (public censure); *In re Grant*, 541 S.E.2d 540 (S.C. 2001) (public reprimand by consent); *Committee on Prof'l Ethics & Conduct of Iowa State Bar Ass'n v. Ramey*, 512 N.W.2d 569 (Iowa 1994) (indefinite suspension with no possibility of reinstatement for three months); *Office of Disciplinary Counsel v. Jones*, 613 N.E.2d 178 (Ohio 1993) (six-month suspension).

would be appropriate.[9] However, while clear and convincing evidence has been presented that Kline violated Rule 3.8 when he failed to turn over the Boyd Hospital Statement to the defense prior to trial, we are mindful of the fact that our comment to Rule 3.8 (e) has created a great deal of confusion when it comes to a prosecutor's disclosure obligations under Rule 3.8. Indeed, the ABA issued a formal opinion[10] on this topic and interpreted our comment to mean that *Brady*

---

[9] An appropriate sanction is one that is necessary to protect the public and the courts, maintain the integrity of the profession, and deter other attorneys from engaging in similar misconduct. *See In re Kline*, 11 A.3d 261 (D.C. 2011) (citing *In re Reback*, 513 A.2d at 231). In determining the appropriate sanction the Court considers: (1) the nature and seriousness of the misconduct, (2) the presence of misrepresentation or dishonesty, (3) the respondent's attitude toward the underlying misconduct, (4) prior misconduct, (5) mitigating or aggravating circumstances, and (6) prejudice to the client. *See In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc).

[10] *See* American Bar Association Formal Opinion, *Prosecutor's Duty to Disclose Evidence and Information Favorable to the Defense* at 4 n.18 (July 8, 2009). The opinion states, in pertinent part:

> Rule 3.8 (d) sometimes has been described as codifying the Supreme Court's landmark decision in *Brady v. Maryland*, which held that criminal defendants have a due process right to receive favorable information from the prosecution. This inaccurate description may lead to the incorrect assumption that the rule requires no more from a prosecutor than compliance with the constitutional and other legal obligations of disclosure, which frequently are discussed by courts in litigation. . . . The ABA adopted the rule against the background of the Supreme Court's 1963 decision in *Brady v. Maryland*, but most understood that the rule did not simply codify existing constitutional law but imposed a more demanding disclosure obligation.

materiality, in the "material-to-outcome" sense, was required to find an ethical violation of Rule 3.8 (e). And, as recently as last year, the Supreme Court of Wisconsin, relying in part on the Comment to our Rule 3.8 as well as the interpretation given to it by the 2009 ABA Formal Opinion, held that a prosecutor's disclosure duties under the ethical rules were co-extensive with their obligations under Brady and thus, there could be no violation of the ethical rule unless the court finds that a *Brady* violation occurred. *See In re Riek*, 834 N.W.2d at 390. When we add in the testimony of an AUSA responsible for training that the U.S. Attorney's Office did not provide any separate training on a prosecutor's Rule 3.8 (e) disclosure obligations, and the argument by Kline that he understood a prosecutor's ethical obligations to be coextensive with his obligations under *Brady* and that no violation of Rule 3.8 (e) can be found independent of a *Brady* violation, we must conclude that his understanding was wrong but it was not unreasonable, and that no sanction is warranted.

In so concluding, we are also taking into consideration no companion violations were charged, no allegations of dishonesty were made, the respondent has a clean disciplinary record, and similar conduct will incur sanctions comparable to that recommended by the BPR in this case now that this court has

provided clear guidance on the scope of a prosecutor's disclosure obligations under Rule 3.8.

*So ordered.*