*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 08-BG-1160

IN RE BARRY K. DOWNEY, RESPONDENT.

A Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 416968 )

On Report and Recommendation
of the Board on Professional Responsibility
(BDN-338-08)

06/29/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

(Argued December 5, 2016                    Decided June 29, 2017)

*William R. Ross*, Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the brief was filed, *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, and *Jelani Lowery*, Senior Staff Attorney, were on the brief, for the Office of Disciplinary Counsel.

*Aron U. Raskas* for respondent.

Before FISHER, *Associate Judge*, and WASHINGTON[*] and RUIZ, *Senior Judges*.

FISHER, *Associate Judge*:    The Board on Professional Responsibility ("Board") recommends that Respondent Barry K. Downey receive an informal admonition.  Disciplinary Counsel argues for disbarment or, at minimum, a three-

---

[*]    Judge Washington was Chief Judge of the court at the time of argument. His status changed to Senior Judge on March 20, 2017.

year suspension with reinstatement conditioned on proof of rehabilitation. These widely differing recommendations arise from the fact that Respondent pled guilty to a felony (albeit, a strict liability offense) but disputes Disciplinary Counsel's allegations that he has been dishonest in explaining the circumstances of that crime and that he committed a crime of moral turpitude. Applying the enhanced burden of proof that Disciplinary Counsel bears and deferring to credibility determinations and factual findings supported by the record, as we are required to do, we adopt the recommendation of the Board.

## I.     Background

Respondent Downey has been a member of the District of Columbia Bar since 1989, focusing his practice on issues related to the Employee Retirement Income Security Act of 1974 ("ERISA"). In the mid-1990s, a friend of Respondent developed a method to use digital currency backed by gold bullion to facilitate monetary transactions over the Internet. This innovation led to the creation of two companies known as Gold & Silver Reserve ("GSR") and E-Gold (collectively "E-GOLD"). Respondent invested in E-GOLD and became Director of E-Gold and Secretary, Vice-President, and Director of GSR.

In 1995, before investing in E-GOLD, Respondent informally consulted a corporate lawyer named David Seidl. Respondent later testified that Mr. Seidl orally advised that E-GOLD was not "doing banking" and was not "subject to banking regulations." Mr. Seidl does not appear to have charged a fee or rendered any written opinion.

Five years later, the District of Columbia enacted a statute requiring a license to engage in a money transmitting business. *See* D.C. Code § 26-1002 (2012 Repl.). Then, in 2001, the Patriot Act changed provisions of the Bank Secrecy Act related to the licensing of money transmitting businesses. *See* 18 U.S.C. § 1960 (a) (2001). In August or September 2002, Respondent sought legal advice from the law firm of Drinker Biddle & Reath about whether the Patriot Act provisions applied to E-GOLD.

In March 2003 Drinker Biddle sent Respondent a memorandum stating that E-GOLD "may wish to consider" whether to register GSR with federal and state authorities. It warned that GSR's operations "may lead it to be categorized as" an entity that would be "vulnerable to a regulatory claim that it is an unregistered money service business." However, the memorandum also stated that "there is no clear answer" to whether E-GOLD qualified as a "financial institution" covered by

the Patriot Act, and "there is no definition that completely captures" E-GOLD's business. The memorandum recommended that E-GOLD consider "whether the benefits" of reaching out to the United States Treasury Department for clarification would "outweigh[] the risks." Regarding state law, the memorandum's appendix noted that "a handful of states have begun to license and regulate such diverse entities as . . . non-bank stored-value issuers, Internet bill payment services and Internet money transfer systems," and that the Uniform Money Services Act had apparently "expand[ed] the term 'money service business.'" It concluded that the companies "may want to survey the laws of the various states to ensure that GSR is not in violation of any licensing requirements for a [money service business]." Respondent believed that the memorandum contained several factual inaccuracies, and he testified that he "did not view [it] as advice on anything." Respondent wanted Drinker Biddle to correct and clarify the memorandum, but he did not receive a revised version.

In or around January 2005, Respondent hired attorney Mitchell Fuerst to advise E-GOLD. Respondent later testified that Mr. Fuerst believed that E-GOLD was not required to register as a money transmitter. By January of the next year, the government had brought a civil forfeiture action against E-GOLD claiming that certain funds that were being transmitted through its service were the proceeds of

money laundering. Mr. Fuerst argued that GSR was not a "money transmitting business" or "domestic financial institution" required to have a license under the Patriot Act. Respondent later testified that these arguments were consistent with Mr. Fuerst's previous advice.

In 2007 the United States charged E-GOLD, Respondent, and other individuals with violations of federal and District of Columbia criminal laws, including conspiracy to commit money laundering and operation of an unlicensed money transmitting business. The government alleged, among other things, that the businesses and the individuals had conspired to conduct financial transactions that involved the proceeds of unlawful activity such as child exploitation and fraud. Respondent pled guilty in the United States District Court for the District of Columbia to a felony violation of D.C. Code § 26-1002, a strict liability offense which prohibits operation of a money transmitting business without a license. The indictment asserted that Respondent committed this crime between 2002 and 2003, and Respondent agreed to a Statement of Offense that gave examples of transactions during those years. As part of a plea bargain, the government dismissed the remaining charges against Respondent, including conspiracy to commit money laundering.

At sentencing, Respondent told Judge Rosemary Collyer that he "did not intend" to violate the law regarding licensing, but he admitted that he "was wrong[.]" Respondent noted that he did not have expertise in the relevant area and claimed that he had "looked to experts just like when others have looked to me on employee benefits issue[s]."

Judge Collyer stated that she "believe[d] [Respondent] when he says that he didn't intend to violate the law." She recognized that Respondent and E-GOLD had been "in a slow prodding comfortable way trying to figure . . . out" their legal obligations, including by "meeting with the government . . . and trying to get advice[.]" Finally, she noted that Respondent "is clearly a good lawyer and a good husband and a good father and a good member of his church in his community and has no criminal history." Judge Collyer sentenced Respondent to 180 days' incarceration, suspended in favor of 36 months' probation, and imposed a $2,500 fine.

Urging this court not to impose an interim suspension, Respondent continued to assert that he had sought legal advice. We decided to defer any sanction, citing, among other things, Respondent's "prior unblemished record as an attorney" and the "fact that his violation arose from conduct outside of his normal

legal practice[.]" *In re Downey*, 960 A.2d 1135, 1137 (D.C. 2008). We also expressed concern that the length of an "interim suspension might exceed the sanction that will eventually be imposed[.]" *Id.*

Recognizing the importance of developing a factual record, we directed the Board to determine whether Respondent committed a crime of moral turpitude. The Board found that the offense did not involve moral turpitude *per se* and referred the matter to a Hearing Committee to determine "whether Respondent's conviction involves moral turpitude on the facts[.]" Before Respondent's hearing, Disciplinary Counsel stated that he had not charged Respondent with committing a crime of moral turpitude on the facts because he did "not have clear and convincing evidence to support making such a charge[.]"

Respondent's Answer again asserted that he had "sought the advice of outside counsel with particular expertise" regarding "compliance issues." The Answer also stated that E-GOLD had been "advised" that it was "not subject to existing statutes and regulations" when the officers and directors "structured their businesses[.]"

During the hearing, Respondent reiterated that E-GOLD "had hired outside counsel to advise it . . . on [regulatory and compliance] issues." When pressed on why he had believed that E-GOLD was never "violating the law," Respondent testified: "Well, that's what the company was being told from the very beginning. I mean, if a question arose, they would hire attorneys or accountants to answer the question and to advise the company on how to be in compliance."

After this testimony, the Hearing Committee ordered Respondent to submit all legal opinions that he had received regarding compliance with state regulations. Respondent disclosed four documents: (1) Respondent's request for Mr. Seidl's advice, (2) the Drinker Biddle memorandum, (3) emails from Respondent to Drinker Biddle disputing the firm's bill, and (4) Mr. Fuerst's motion in the 2006 civil forfeiture proceeding.

After reviewing these documents, Disciplinary Counsel asserted that there was a "substantial conflict" between the documents and Respondent's prior testimony at the disciplinary hearing and in other proceedings. After cross-examining Respondent again, Disciplinary Counsel argued that Respondent should be disbarred because he had been convicted of a serious crime, he had exhibited "flagrant" dishonesty when claiming that he had relied on advice of counsel, and

"the circumstances surrounding Respondent's guilty plea involve[d] moral turpitude[.]"

The Hearing Committee agreed that Respondent had committed a serious crime, but the majority found that "Respondent's claim that he relied on the advice of counsel" was "credible[.]"  It noted that Respondent had in fact "repeatedly sought legal advice, and the evidence does not clearly show either that he was advised that the regulations applied to E-GOLD or that he ignored such advice." The majority further noted that "nothing about Respondent's demeanor while testifying causes us to question his truthfulness."  On the moral turpitude question, the Committee unanimously concluded that there was no evidence that Respondent intentionally failed to register E-GOLD in order to facilitate criminal activities. The majority of the committee recommended that Respondent receive an informal admonition.[1]  The Board affirmed, unanimously[2] concluding that Disciplinary Counsel had not proven either dishonesty or moral turpitude.

---

[1]  The Hearing Committee Chair dissented, agreeing on the serious crime and moral turpitude questions but concluding that Respondent had "repeatedly lied."  The Chair recommended a three-year suspension.

[2]  Two members of the Board had recused themselves.

Disciplinary Counsel takes exception to the Board's order, arguing that Respondent committed a crime of moral turpitude on the facts and was dishonest. Respondent disagrees and asks us to uphold the Board's recommendation of an informal admonition.

## II. Standard of Review

Disciplinary Counsel must prove by clear and convincing evidence both its claim that Respondent committed a crime of moral turpitude and its claim that Respondent was dishonest. *See, e.g.*, *In re Allen*, 27 A.3d 1178, 1184 (D.C. 2011) (moral turpitude on the facts); *In re Chapman*, 962 A.2d 922, 925 (D.C. 2009) ("[D]eliberately false testimony" is "a significant aggravating factor" in favor of enhancing sanction.); *In re Cater*, 887 A.2d 1, 25 (D.C. 2005) (Disciplinary Counsel must "prove the facts that justify the enhancement [of a sanction] with evidence that is clear and convincing.").

This court defers to the factual and credibility findings made by the Hearing Committee and the Board unless they are unsupported by substantial evidence. D.C. Bar R. XI, § 9 (h)(1). We review questions of law and ultimate facts *de novo*. *In re Martin*, 67 A.3d 1032, 1039 (D.C. 2013). Moreover, we adopt a sanction

recommendation "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." *In re Daniel*, 11 A.3d 291, 299 (D.C. 2011). When we "disagree[] with the Board as to the seriousness of the offense," we may give the Board's recommendation "less weight." *Id.* at 300.

### III.    Analysis

Because he pled guilty to a felony, Respondent does not contest that he committed a "serious crime." *See* D.C. Bar R. XI, § 10 (b) ("The term 'serious crime' shall include (1) any felony . . . ."). Thus, the only issues before us are whether Respondent committed a crime of moral turpitude, whether he was dishonest, and what sanction is appropriate.

### A.  Whether Respondent Committed a Crime of Moral Turpitude

A crime involves moral turpitude if it "offends the generally accepted moral code of mankind"; involves "baseness, vileness or depravity"; or "is contrary to justice, honesty, modesty, or good morals." *In re Rehberger*, 891 A.2d 249, 251 (D.C. 2006) (internal quotation marks and citations omitted). We must disbar an

attorney who has been convicted of a crime of moral turpitude.  D.C. Code § 11-2503 (a) (2012 Repl.).

Disciplinary Counsel argues that Respondent "facilitated" crimes that "involve moral turpitude" such as "credit card fraud, investment fraud, and distribution of child pornography."  He emphasizes that the government alleged those facts as part of its charge that Respondent conspired to engage in money laundering.[3]  But Respondent was not convicted of facilitating credit card fraud, investment fraud, or distribution of child pornography.  In fact, the government dismissed its charges against Respondent for conspiring to engage in money laundering.  Respondent was convicted instead of a strict liability offense which did not require proof of *scienter*:  operating an unlicensed money transmitting business.

Nor did Respondent admit facts establishing crimes of moral turpitude when he pled guilty.  To be sure, the count of the indictment that alleged a licensing violation contained cross-references to other allegations.  During the plea colloquy,

---

[3] Disciplinary Counsel also argues that Respondent's subsequent dishonesty before Judge Collyer and in disciplinary proceedings indicates that he intentionally failed to register E-GOLD in order to benefit financially from criminal activity. Because we hold below that Disciplinary Counsel did not prove that Respondent was dishonest before those tribunals, we reject this argument.

however, Judge Collyer read from or summarized the Statement of Offense, which only contained facts related to the licensing offense. Disciplinary Counsel introduced no independent proof of moral turpitude, and he cannot rely upon the unproven allegations of the indictment to meet his burden.

Every single member of the Hearing Committee and the Board who analyzed this question found that Disciplinary Counsel *had not proven* moral turpitude. On this record, we find no basis to disagree. *See, e.g.*, *In re Allen*, 27 A.3d at 1187 (declining to find moral turpitude because "[i]n the end, this case turns on the allocation of the burden of proof").

## B. Whether Respondent Was Dishonest

Disciplinary Counsel also argues that Respondent's statements to Judge Collyer and in subsequent proceedings were misleading because he could not have relied on advice of counsel at the time he committed the offense of which he was convicted. Disciplinary Counsel reads Drinker Biddle's 2003 memorandum as "suggesting registration was required." He stresses that the Statement of Offense indicates that Respondent committed the crime during 2002 and 2003, around the

same time that he was allegedly rejecting Drinker Biddle's advice and *before* he received more favorable advice from Mr. Fuerst in 2005.

As the dissenting opinion of the Hearing Committee Chair demonstrates, this is not a frivolous claim. However, we are not persuaded that Disciplinary Counsel proved dishonesty as an aggravating factor by clear and convincing evidence. *See In re Cater*, 887 A.2d at 25. Until the first disciplinary hearing, Respondent essentially stated that he was not an expert in the field, that he had sought the advice of counsel, and that he had been advised that E-GOLD was "not subject to existing statutes and regulations" when the company was being "structured."[4] The record lends some support to these statements. Respondent is an ERISA lawyer who sought advice from Drinker Biddle in 2002 and from Mr. Fuerst, who argued in January 2006 that GSR was not required to have a license under the Patriot Act. Further, Respondent testified that Mr. Seidl advised that E-GOLD was not "doing

---

[4] Disciplinary Counsel also notes statements made by Respondent's counsel at sentencing and during disciplinary proceedings. Even assuming that we can impute these statements to Respondent, many of them are properly interpreted as advocacy rather than factual representations. In any event, these statements are largely duplicative of the statements by Respondent that we have summarized.

banking" and was not "subject to banking regulations" when the company was being formed in the mid-1990s.[5]

In addition, the Drinker Biddle memorandum is too ambiguous to prove that Respondent knew he had to register E-GOLD. It uses equivocal language, such as that E-GOLD "may wish to consider" whether to register and that GSR's operations "may lead it to be categorized as" an entity that would be "vulnerable[.]" The memorandum also stated that "there is no clear answer" to whether E-GOLD would meet the definition of a "financial institution." Ultimately, it recommended that E-GOLD consider "whether the benefits" of contacting the government for more information would "outweigh[] the risks." Regarding state law, it indicated that some states had begun to license "diverse entities," but it merely recommended that the companies "may want to survey the laws of the various states[.]" Further, there is substantial evidence that Respondent

---

[5] We are also satisfied that Respondent's remarks to Judge Collyer were not intentionally misleading when placed in context. Judge Collyer's question whether Respondent should be sentenced more harshly than his co-defendants because he is a lawyer sparked a lengthy exchange between Respondent's counsel and the government. Given this focus on Respondent's status as an attorney, it is not surprising that Respondent would briefly reiterate that he was not an expert in this area of the law and had attempted to consult attorneys who were. Further, Judge Collyer's remark that Respondent and E-GOLD were "in a slow prodding comfortable way trying to figure . . . out" their legal obligations indicates that she knew that Respondent had not received concrete advice on the registration issue at all relevant times.

believed that the memorandum contained factual errors that could have affected the legal analysis.

We acknowledge that Respondent's statement before the Hearing Committee—that E-GOLD had been "told from the very beginning" that it was not violating the law—is troubling. Certain statements in the Drinker Biddle memorandum, such as that GSR may be "vulnerable to a regulatory claim" indicated that E-GOLD might have to grapple with compliance issues. Moreover, there is no evidence in the record that Respondent sought or received advice about D.C. law specifically.

Nonetheless, we find persuasive the Board's examination of the context surrounding Respondent's statement, including his subsequent elaboration that the regulatory climate was uncertain, that government publications had at times indicated that registration might not be required, and that one of Respondent's partners had met with the government. Respondent also testified that E-GOLD had hired Ernst & Young to advise it on how to structure its business and to comply with regulatory laws. Thus, as the Board noted, Respondent's statement could be interpreted as referring to multiple sources, not just legal counsel, for his belief that E-GOLD was not violating the law. In addition, Respondent testified that Mr.

Seidl advised that E-GOLD was not subject to regulations when the company was being formed, and Mr. Fuerst later gave advice that would have reaffirmed that belief.

The statement that E-GOLD had been "told from the very beginning" that it was not violating the law comes perilously close to being misleading, but the Hearing Committee ultimately found that Respondent was credible. Indeed, every member of the Hearing Committee (save one) and the Board who analyzed this question found that Disciplinary Counsel had failed to prove dishonesty by clear and convincing evidence. There are no affirmative findings that Respondent was honest and did not mislead. This case likely would turn out differently if Respondent had the burden of proof. But Disciplinary Counsel had the burden to show, by clear and convincing evidence, that Respondent was dishonest. In this case, he has failed to meet that burden.

## C. The Appropriate Sanction

Having held that Disciplinary Counsel did not meet his burden to prove moral turpitude or dishonesty, we are left with the fact that Respondent was

convicted of a serious crime. The undisputed fact that Respondent committed a felony makes the choice of an appropriate sanction especially difficult.[6]

Further, although Disciplinary Counsel did not prove that Respondent's conduct rose to the level of moral turpitude, the crime to which Respondent pled guilty has consequences beyond the simple failure to file a registration form. As Judge Collyer noted:

> [T]he failure to register is what leads to the ability of criminals to make use of the E-Gold system for nefarious purposes . . . . Because once you register you have to report things and therefore it's not as anonymous or private . . . . So on one hand it's just a regulatory compliance issue. On the other hand it's a very serious problem[.]

---

[6] The cases that the Board and Respondent cite in support of an informal admonition do not involve a "serious crime." *See, e.g.*, *In re Sofaer*, 728 A.2d 625, 626 (D.C. 1999) (violation of a disciplinary rule involving work on matters that lawyer participated in when serving as a public employee); *In re Confidential*, 670 A.2d 1343, 1343 (D.C. 1996) (violation of a disciplinary rule involving splitting of fees); *In re L.R.*, 640 A.2d 697, 701 (D.C. 1994) (violation of a disciplinary rule when respondent misunderstood the payment system under the Criminal Justice Act). Respondent also points to *In re Kline*, 113 A.3d 202 (D.C. 2015), but that is not an informal admonition case. *See id.* at 216 (declining to impose a sanction). Nor does it involve a serious crime. *See id.* at 214 (holding that a prosecutor violated a disciplinary rule related to disclosure obligations).

Given the serious consequences that may follow from a failure to register, and the fact that Respondent has been convicted of a felony, it is far from obvious that an informal admonition is a sufficient sanction. *See In re Allen*, 27 A.3d at 1188-89 (noting that the fact that respondent's conduct "did not involve moral turpitude does not diminish the severity of respondent's misconduct").

Ultimately, however, we must keep in mind that "the purpose of imposing a sanction is not to punish the attorney, but to protect the public and the courts, safeguard the integrity of the profession, and deter respondent and other attorneys from engaging in similar misconduct." *In re Cater*, 887 A.2d at 17. Here we emphasize that Respondent's misconduct did not arise from his practice of law, and that the goal of deterring similar conduct has been served by the prosecution of criminal charges. We therefore defer to the Board's careful weighing of the circumstances:

> This case presents the rare, if not unique, situation wherein a respondent pleaded guilty to a single non-*scienter* felony unrelated to the practice of law, the crime was committed in a climate of legal and regulatory uncertainty, Bar Counsel has failed to prove moral turpitude or dishonesty by clear and convincing evidence, there are no other disciplinary charges, and Respondent's disciplinary record and character are unblemished.

## IV.   Conclusion

The order of the Board on Professional Responsibility is hereby affirmed. Disciplinary Counsel is directed to issue an informal admonition to Respondent for his conviction of a serious crime.

*It is so ordered.*